377 So.2d 1301 (1979)
Ronnie BRUMMERLOH et al., Plaintiffs-Appellees,
v.
FIREMEN'S INSURANCE CO. OF NEWARK, N. J., et al., Defendants-Appellants.
No. 7254.
Court of Appeal of Louisiana, Third Circuit.
November 12, 1979.
Rehearings Denied January 15, 1980.
*1302 William J. Doran, Jr., Baton Rouge, for defendant-appellant-appellee.
Watson, Murchison, Crews, Arthur & Corkern by Ronald E. Corkern, Jr., Natchitoches, Trimble, Randow, Smith & Wilson, James T. Trimble, Jr., Gold, Little, Simon, Weems & Bruser, John F. Simon, Alexandria, for defendant-appellee-appellant.
McKinley & O'Neal, Hodge O'Neal, III, Monroe, for plaintiffs-appellees.
Before CUTRER, STOKER and DOUCET, JJ.
CUTRER, Judge.
This is a suit for damages for personal injuries received by Ronnie Brummerloh; his wife, Sherrie Sue; and their two minor children, Kimberly and Scottie, as a result of a two vehicular accident involving an automobile driven by plaintiff, Ronnie *1303 Brummerloh, and a vehicle driven by Tom Elkins.
The accident occurred after dark, shortly past 6:00 P. M., on January 18, 1972, near but inside the western city limits of the City of Natchitoches, Louisiana, on Louisiana Highway 6. There was a misty rain at the time of the accident. Brummerloh was proceeding east along Highway 6 toward Natchitoches, approaching a bridge which spanned a bayou. Brummerloh stated that, as he was so proceeding, another vehicle was approaching with its bright lights on. Brummerloh testified that the bright lights blinded him and he could not ascertain the location of the center line of the highway. As he crossed the bridge, Brummerloh pulled slightly to his right to avoid the possibility of hitting the oncoming car (Tom Elkins' vehicle). Brummerloh stated that as he approached the bridge and the bright lights, he slowed his car to 35 miles per hour. After Brummerloh crossed the bridge, his two right wheels dropped off the pavement into a rut. This caused Brummerloh to lose control of his automobile which swerved into the westbound lane of traffic. His vehicle collided with the Elkins' vehicle, resulting in injuries to Brummerloh, his wife, and their two children.
Several years before the accident, the Highway Department had entered into a maintenance agreement with the City of Natchitoches, which provided for maintenance of certain streets within the Natchitoches city limits, which streets were part of the State highway system. The agreement included Highway 6 up to the city limits.
On May 21, 1971, the Highway Department entered into a construction contract with Louisiana Paving Company for the construction of two additional lanes of travel along Highway 6 and the improvement of the existing two lanes of travel, extending from the Natchitoches By-Pass westerly for a distance of 1.27 miles. This construction program would include the area of the accident.
Suit was filed by Brummerloh, individually, and on behalf of his two minor children. Mrs. Brummerloh also joined as a party plaintiff for damages due to her injuries. Parties defendant were the State of Louisiana Through the Department of Highways (Highway Department);[1] the liability insurers of Tom Elkins, Firemen's Insurance Company of Newark, New Jersey (Firemen's) and Reliance Insurance Company (Reliance); the City of Natchitoches (City); its insurer, Hartford Accident and Indemnity Company (Hartford); and Louisiana Paving Company (Louisiana Paving). The Highway Department, the City and Louisiana Paving filed third party demands against each other, which raised the questions of whether the City and/or Louisiana Paving were responsible for the maintenance of the shoulders of the highway under their respective contracts with the Highway Department. The City also filed a third party demand against Hartford, contending that Hartford owed the City a defense under the insurance contract issued by Hartford to the City.
Prior to trial the claims against Tom Elkins' insurers, Firemen's and Reliance, were compromised and all claims were dismissed as to these parties.
Upon trial of the matter, the trial court rendered judgment in favor of the plaintiffs, and against the Highway Department and Louisiana Paving, in solido. The trial court also concluded that Tom Elkins was negligent and reduced each of the awards by one-third (1/3). The plaintiffs' suit against the City and its alleged insurer, Hartford, was dismissed. Judgment was rendered in favor of the City on its third party demand against Hartford, awarding the City attorney's fees for a defense of the suit. All other third party demands were dismissed.
From this judgment, the plaintiffs appealed insofar as it dismisses the plaintiffs' claim against the City and Hartford. Plaintiffs also answered the appeals of the defendants seeking an increase in quantum. Louisiana Paving and the Highway Department appeal the judgment against them. Hartford appeals from the judgment against it for attorney's fees. The City *1304 answered the Hartford appeal seeking an increase in attorney's fees.
The issues presented by these appeals are whether the trial court erred in the following respects:
(1) By finding the Highway Department negligent;
(2) By finding that Ronnie Brummerloh was free of contributory negligence;
(3) By finding Louisiana Paving negligent;
(4) By dismissing plaintiffs' claim and the third party demands against the City and its insurer, Hartford;
(5) By awarding attorney's fees to the City against Hartford on the ground that Hartford had a duty to defend the City;
(6) By denying legal interest on attorney's fees awarded the City;
(7) By finding that Tom Elkins was guilty of negligence and thus granting a reduction of the awards;
(8) By awarding inadequate damages.
(1) Liability of the State of Louisiana Through the Department of Highways.
The Highway Department contends that the plaintiffs failed to prove that there existed any condition on the roadway at the time of the accident which was obviously unsafe for a driver using ordinary care. The Highway Department also contends that, in the event such a condition did exist, plaintiffs have failed to prove that the Highway Department had actual or constructive knowledge of same.
In the recent case of Brown v. Louisiana Dept. of Highways, 373 So.2d 605 (La.App. 3rd Cir. 1979), this court set forth the responsibilities of the Highway Department as follows:
"The legal responsibility of the Department as to highway accidents was generally stated by this court in LaBorde v. Louisiana Department of Highways, 300 So.2d 579 (La.App. 3 Cir. 1974), writ denied, 303 So.2d 182 (La.1974) as follows:
`The Department of Highways is not responsible for every accident which occurs on state highways. It is not a guarantor of the safety of travelers thereon, or an insurer against all injury or damage which may result from defects in the highways. The duty of the Department of Highways is only to see that state highways are reasonably safe for persons exercising ordinary care and reasonable prudence. The department is liable for damages only when it is shown (1) that the hazardous condition complained of was patently or obviously dangerous to a reasonably careful and ordinarily prudent driver, and (2) that the department had notice, either actual or constructive, of the existence of the defect and failed within a reasonable time to correct it.'
Also, see U. S. F. & G. Co. v. State, Dept. of Highways, 339 So.2d 780 (La.1976) and Guin v. State Through Dept. of Highways, 360 So.2d 1185 (La.App. 3 Cir. 1978).
"Included within the Department's duties is the maintenance of the shoulders of the highway in a reasonably safe condition. Rue v. State, Department of Highways, 372 So.2d 1197 (La.1979)."
This accident occurred shortly after 6:00 P. M. on January 18, 1972. Among the first persons to arrive at the scene of the accident was Larry G. Fontenot, an insurance salesman and resident of the City. When he arrived, he went to the cars involved, which were "locked together" in the north (westbound) lane of the highway. When he arrived, the engine of the Brummerloh vehicle was still running and steam was emitting from same. He saw Brummerloh and one child in the car. Mrs. Brummerloh had fallen out of the car and was lying in or near the north ditch.
Fontenot lived just west of the scene at the time of the accident. He traveled the road each day going to and from work. He had previously noticed deep ruts in this area adjacent to the pavement on several occasions. He stated that previously his vehicle dropped off the pavement into ruts in this area and he was aware of such a condition existing in this particular area of the roadway. As to the condition of the south shoulder at the time he arrived at the scene, we quote testimony as follows:

*1305 "Q. These ruts, were they there at the time you arrived at the scene of this accident?
"A. Yes, they were.
"Q. Particularly, can you tell us where they started in relation to the bridge and where they ended up, to the best of your recollection?
"A. I don't know, uh, it seemed like right off of the bridge, it wasn't near as bad, but when I got farther down, it seemed like the ruts got deeper and not too far from the bridge, I would say.
"Q. Did these ruts ...
"A. As best as I can remember.
"Q. Did these ruts extend to the place in the highway where these two vehicles were locked together?
"A. It's seems to me like it was a pretty good ways up the highway. I'd say, uh, a hundred and fifty, two hundred yards, for sure, you know.
"Q. But, from where?
"A. From the bridge.
"Q. To where the ruts ended?
"A. Yes, uh-huh. I don't remember exactly how far the vehicles were from the bridge that night. You know, I was more or less interested in trying to help the people at the time.
"Q. Had you noticed that kind of condition on that highway on previous occasions?
"A. Yes, I did. Almost every time it rained, it seemed to get water standing in the ruts along the edge."
Fontenot was also shown photographs which were made the night of the accident for the police investigation. He stated that the condition of the south shoulder, as it appeared in the photographs, reflected the same condition that he saw when he arrived at the scene. We have examined these photographs which reflect a rut approximately 6 inches deep along the edge of the pavement.
Another witness who testified as to the condition of the shoulder at the scene of the accident was Forrest Kavanaugh, a photographer who worked with the City's police department by making photographs of accident scenes. On the night in question, he received a call at 6:25 P. M. and arrived on the scene at 6:32 P. M. He testified that the traffic was stopped at the scene when he arrived. A second accident had occurred on the bridge, which accident occurred shortly after the accident in question. The two accidents in the same area effectively blocked traffic along the highway. Kavanaugh made several photographs of the scene, including those examined by Fontenot, as mentioned above. Kavanaugh further testified that there was a drop-off from the pavement which was 8 to 10 inches deep. This drop-off began within approximately 15 feet of the bridge and extended east to the vicinity of the accident scene.
As we examine this testimony, the testimony of Brummerloh and the photographs, we conclude that the dangerous condition existed at the scene of the accident and at the time the accident occurred.
Having so concluded, we must next determine whether the Highway Department had either actual or constructive notice of such condition.
The record clearly reflects that the roadway in the area of the accident contained an unusual condition which was conducive of creating the hazardous shoulder condition which existed at the time of the accident. As a driver of a vehicle traveling east approached the bridge, he would be traveling on a smooth hard surfaced road approximately 19½ feet wide including the drain curb and gutter. This type of roadway extended up to the bridge. The bridge width was approximately 21 feet. As the highway left the bridge, going east, it was 21 feet wide for approximately 100 feet east of the bridge. Within the next 90 feet the paved portion of the roadway narrowed from the 21 foot width to a width of 17 feet 10 inches. As a driver traveled this narrowing portion, it was necessary for him to make a transition from the wider roadway to the narrower roadway. He had approximately 100 feet to ascertain such narrowing and to adjust the vehicle to make the transition. There were no signs, nor any type of delineation devices along the roadway to warn the public of the transition necessitated by the narrowing of the roadway. The *1306 shoulders were unstabilized, that is, dirt with some gravel on same.
As a result of this condition, the shoulders on the east side of the bridge were continuously in need of repair. Vehicles traveling east, and especially trucks, would fail to make the transition in time to keep their wheels from dropping off the pavement, keeping the shoulder depressed, creating a dangerous condition. This situation had existed for several years.
Oscar Delrie, Jr., Superintendent of Public Works for the City, supervised the maintenance of this area along Highway 6 for several years prior to the contract with Louisiana Paving, as the City had a maintenance contract with the Highway Department. He testified as follows:
"Q. Now, what was it about that those shoulders on Highway 6 out near the bridge that required that kind of maintenance attention?
"A. Well, during that time the road was narrow. And, you had big trucks going back and forth. Like I say, when youtwo trucks met, well, they naturally had theirtheir dual wheels would fall off the edge of the pavement, which kept the roadshoulders of the road beat out right next to the pavement.
"Q. Would you find over a period of years, even before this contract was let, that ruts would be created along the edge of the pavement on both sides of that road?
"A. Yes, sir. That's the reason we had to keep it bladed so often, because of the ruts.
"Q. Well, since this was a narrow road to begin with and since the shoulders were dirt with some gravel and not stabilized and not paved, did you find that you had to spend an extra amount of time on that road, more than other roads?
"A. Yes, sir."
Forrest Kavanaugh, the police photographer, testified that he had noticed the bad shoulder condition on the east side of the bridge for approximately two years before the accident. This testimony was corroborated by Mr. Fontenot, the insurance salesman, whose testimony we have previously discussed.
Troy J. Vascocu, Parish Maintenance Superintendent for the Highway Department, stated that from time to time before the accident, he had noticed that in the area where the road narrows, that wheels of vehicles would drop off the pavement, causing ruts in the shoulder adjacent to the pavement.
Daniel W. Bradford, an engineer for the Highway Department, moved into the Natchitoches area in October of 1971. He was acting as project engineer on the construction to be done by Louisiana Paving. He stated that he visited the area of the project practically daily. He stated that previous to the accident, from time to time, he had seen ruts along the pavement at the accident area which would be as much as 6 to 8 inches deep. These ruts would extend for 200 to 300 feet eastward from the bridge area.
Both Mr. Vascocu and Mr. Bradford stated that the Highway Department had not performed any maintenance work on the shoulders of this area prior to the accident. No request for maintenance of the shoulders was made of Louisiana Paving until after the accident. There was some testimony that the City may have performed some grading of the shoulders on one occasion in December before the accident, but this is disputed by Oscar Delrie, Jr., the Superintendent of Public Works for the City. Delrie stated that the City had performed no maintenance work on the shoulders after the Highway Department and Louisiana Paving had installed the signs on Highway 6 designating the area as "under construction." Delrie stated that his office was notified by Mr. Vascocu that the City was to perform no further maintenance as the area was under contract. This notification by Vascocu was made in August or September of 1971. Vascocu admitted in his testimony that he did so notify the City to cease maintenance.
This summary of evidence clearly reflects that the dangerous condition (narrowing of the roadway and unstabilized shoulders which contained ruts along the *1307 pavement) existed at the time of the accident in question, which condition was obviously dangerous to a careful driver. The Highway Department had prior knowledge that such a dangerous condition had existed for a long period of time before the accident and the Highway Department took no steps to remedy same, nor to install any devices warning the public of such a condition. We thus hold that the record supports the trial court's conclusion that the Highway Department was negligent in allowing such a dangerous condition to exist, which condition caused the occurrence of the accident in question.
(2) Contributory Negligence of Ronnie Brummerloh.
The Highway Department contends that Ronnie Brummerloh was negligent by continuing to drive at 35 miles per hour under rainy conditions and after being blinded by the oncoming car.
Brummerloh testified that he slowed his car to 35 miles per hour as he approached the bridge and the oncoming car. As he approached the bridge, he was partially blinded by the lights of the Elkins car. He crossed the bridge, pulled slightly to his right to avoid the oncoming car, at which time his right wheels dropped off the pavement into the ruts on the shoulder, which resulted in the loss of control, causing the accident. He also stated that he was not acquainted with the condition that we have previously discussed. He had used this roadway only a few times.
The contention of the Highway Department that Brummerloh was contributorily negligent under such circumstances is fully answered in the recent case of Rue v. State, Dept. of Highways, 372 So.2d 1197 (La. 1979). In that case, Mrs. Rue had inadvertently driven off the highway onto its shoulder and lost control of her vehicle, causing an accident and her injuries. The Supreme Court, reversing this court (which held that Mrs. Rue was barred from recovery by her contributory negligence), held as follows:
"Under a simple `but-for' analysis the accident would not have occurred had either the Highway Department not been negligent in failing to maintain the shoulder or the plaintiff not been negligent (and for present purposes we assume her inadvertent meandering was negligence) in moving the vehicle onto the shoulder. But this does not conclude the inquiry. Focusing on plaintiff's `substandard' conduct the question is whether the risk of injury from striking an unexpected, negligently maintained highway shoulder was a risk reasonably related to plaintiff's failure to drive entirely on the paved portion of the highway. We conclude that it was not. A motorist has a right to assume that a highway shoulder, the function of which is to accommodate motor vehicles intentionally or unintentionally driven thereon, is maintained in a reasonably safe condition. Conversely the Highway Department's duty to maintain a safe shoulder encompasses the foreseeable risk that for any number of reasons, including simple inadvertence, a motorist might find himself traveling on, or partially on, the shoulder.
"We conclude that plaintiff's conduct if indeed it was substandard is no bar to her recovery of damages occasioned chiefly because the Highway Department negligently failed to maintain a safe highway shoulder."
In the situation at hand, assuming that Brummerloh's conduct was substandard, such conduct would not bar his recovery of damages which were occasioned chiefly because the Highway Department negligently failed to maintain a safe highway shoulder. This contention by the Highway Department is without merit.
(3) Liability of Louisiana Paving.
The Highway Department, plaintiffs, the City, and Hartford, all contend that under its contract with the Highway Department, Louisiana Paving had a duty to maintain the shoulders of Highway 6 during the existence of the contract.[2]
*1308 That portion of Highway 6 on which the accident occurred on January 18, 1972 was under a construction contract let to Louisiana Paving by the Highway Department. This contract was for the purpose of upgrading Highway 6 into a four lane highway for 1.27 miles which would tie into the Natchitoches By-Pass and extend to the west beyond the city limits. The plan for construction was that the two new lanes would be constructed first and then the existing Highway 6 would be upgraded to complete the project.
The contract was let May 21, 1971. On June 8, 1971, a conditional work order was issued by the Highway Department to Louisiana Paving. Louisiana Paving could begin such construction on the two new lanes as would not interfere with the removal of utility lines located in the proposed additional lanes.
In September or October 1971, a subcontractor cleared the new right of way area of trees and brush, and removed two frame buildings which were on the right of way for the two new lanes that were to be constructed south of the existing roadway. These operations did not involve the existing Highway 6 roadway or shoulders.
During the period from August 21, 1971 and the date of the accident, the only work Louisiana Paving did was to drive a test pile in the right of way for the two new lanes. This involved three hours of work. Louisiana Paving had no other equipment on the project site before the accident, nor was the existing Highway 6 used by or worked upon by Louisiana Paving prior to the accident. At no time, until after the accident, did the Highway Department request that Louisiana Paving perform any maintenance on the shoulders.
Plaintiffs and defendants, as third party plaintiffs, contend that the contract provisions requiring the contractor to maintain the work during construction, and to maintain traffic in a safe manner which included shoulder maintenance and adequate warning, places responsibility on the contractor.
*1309 Louisiana Paving cites McClendon v. T. L. James & Company, 231 F.2d 802 (5th Cir. 1956) in support of its position that it was not responsible for any maintenance of the existing highway under the contract prior to the time that it began actual construction that involved the existing highway, or affected or could effect the traffic conditions using such highway.
In McClendon, the contractor was engaged by the Louisiana Department of Highways to widen and resurface an existing highway. Actual construction was being conducted on six miles of the contract area. There was a crack in the highway located in a section on which work had not been commenced, but which was within the contract area. A collision between two vehicles was caused by the defect and suit followed. There was evidence that the defect was in no way brought about by the contractor, that it had existed for a considerable length of time and had not been altered by the contractor.
The court, in McClendon, examined the contract which included provisions similar to those herein, and held as follows:
"The obligation to `provide for and maintain through and local traffic at all times during the construction of this project' was to make certain that the highway would not be closed during the work. This was, of course, of great importance in determining the proposed plan for doing the work and its effect on the Contractor's estimate and bid. It further meant that as the work was being done with the traffic flow left open, the Contractor should exercise due care, by suitable warning devices, temporary or improvised by-passes or the like, to afford reasonably safe passage to the traveling public. Whenever, then, the contractor's work, completed or in progress, gave rise to a likely hazard not otherwise existing, it would impose the burden of these contract obligations on the Contractor. Such provisions in the contract and Standard Specifications as those relating to keeping one-half of the roadway and all intersections open, construction materials off of traveled portions, specifying intervals (1320 feet) to be kept between work simultaneously done in one lane, the machining and dragging of the subgrade and newly laid materials, and the like, furnish intrinsic proof that the maintenance and the warnings related to those portions and the adjacent areas of the project on which the Contractor was, or had been engaged in actual operations. Conversely, with respect to portions not yet worked on, the Contractor had no contractual duty of maintenance, repair or warning. As to any such portions, its duties were those, and only those, imposed generally by law."
See also, Davis v. T. L. James & Company, 154 So.2d 640 (La.App. 1st Cir. 1963), where the court sustained motions for summary judgment filed by defendant construction companies on the ground that defendants were not obligated to repair a dangerous condition which preceded the contracts with defendants. The court held as follows:
"From the above it is apparent that the alleged defect in the roadway was not created as a result of any act or omission on the part of either of the defendants Spohrer or James. The roadway was in the same condition at the time of the accident as it was when Spohrer assumed its obligation under the contract; hence, neither Spohrer nor James can be said to have had any legal duty to either repair the alleged defect or to warn motorists of its existence and, in the absence of such legal duty, they cannot be held liable to a person whose injury may have been caused thereby." 154 So.2d 640, at p. 642.
The facts here are strikingly similar to those of McClendon and Davis. The defective condition described herein preceded the execution of the construction contract. The condition had been in existence for several years. Louisiana Paving had performed no work on the existing Highway 6 prior to the accident. It had no construction equipment on the job site.
We conclude that the contract does not impose any obligation upon the contractor to remedy such a long standing dangerous condition in Highway 6, which condition cannot be attributed to any activities of Louisiana Paving in the execution of *1310 its work under the contract. Furthermore, Louisiana Paving, not having created the condition by its activities, cannot be held liable to third parties, who may have suffered losses thereby, under the general tort law of this state.
Plaintiffs argue that the contractor should be held strictly liable under Civil Code Art. 2317 based on alleged custody of the contractor of the highway. We find that Art. 2317 is inapplicable. Plaintiffs cite Washington v. T. Smith & Son, 68 So.2d 337 (La.App.Orl.1953), for proposition that agent or contractor is liable under Art. 2317 for things in his control. Louisiana Paving had assumed no control over the defective area in this case.
Plaintiff also cites Young v. Louisiana Department of Highways, 301 So.2d 724 (La.App. 2nd Cir. 1974), to support contractor's liability under Art. 2317. However, Young holds only that plaintiff in that case stated a course of action and had a right of action. No decision was made as to applicability of Art. 2317 though the court mentioned the article.
Plaintiff also relies on Loescher v. Parr, 324 So.2d 441 (La.1975), which held as follows:
"... The owner-guardian of the defective tree is therefore liable for his legal fault in maintaining the defective tree and in preventing its vice from causing injury, unless he prove that the damage was caused by the fault of the victim, by the fault of a third person, or by an irresistible force."
In the present case, the condition or defect was the creation of the Highway Department through the combination of design, lack of maintenance and failure to warn.
The Highway Department was the party responsible for the maintenance of the shoulders until that responsibility shifted to the contractor under the contract. Having determined that such responsibility had not shifted, we find that the contractor did not have custody or control over the shoulders to the extent that it bears responsibility for damages caused by defects in the shoulder not of its own creation. The Loescher case is not applicable.
We hold that the trial court erred in rendering judgment against Louisiana Paving and this portion of the judgment must be reversed.
(4) Liability of the City of Natchitoches.
In 1956, the City entered into a maintenance agreement with the Highway Department wherein the City would be reimbursed for the maintenance of streets within the City which formed part of the Louisiana Highway system. Highway 6 was such a highway. The City was obligated to grade and maintain the shoulders of these streets including that part of Highway 6 within the corporate limits.
Oscar Delrie, Jr., Superintendent of Public Works for the City, testified that the City had maintained the shoulders of Highway 6 continuously under the terms of the 1956 contract. The City continued to so perform until the construction signs were installed informing the traveling public that the area in question was under construction. These signs were installed in August or September 1971.
At about the time the construction signs were installed, Troy J. Vascocu, the Parish Maintenance Superintendent for the Highway Department, testified that he discussed the future maintenance of Highway 6 with Floyd Harper, Director of Public Works for Natchitoches, wherein Vascocu informed Harper that since the construction signs had been installed for the project area, the City would no longer be responsible for maintenance of Highway 6 within such construction area. Vascocu explained that he assumed that all maintenance of the highway, from the beginning of the contract to the completion of same, was to be done by the contractor.
Melvin Jackson, an engineer for the Highway Department, in charge of maintenance, and Vascocu's superior, testified that Vascocu's order to Harper not to maintain Highway 6 after the construction signs were installed, was consistent with the policy of the Highway Department.
*1311 The trial judge apparently dismissed the claims against the City on the ground that the City could rely on the order of Vascocu since he was the parish maintenance superintendent for the Highway Department. We agree with this conclusion. The Highway Department does not dispute Vascocu's authority to issue such an order. Furthermore, Vascocu's superior stated that such an order would be consistent with the Highway Department's policy.
Under these circumstances, the City was not obligated to maintain the shoulders after the construction signs were installed. There is a contention that the evidence reflects that the City actually did maintenance work on the shoulders of Highway 6 on one instance in December of 1971. The City denied such maintenance.
The trial court apparently accepted the testimony of the City in this regard. The record fully supports the trial court's conclusion in this regard. We find no manifest error in such a conclusion.
(5) Duty of Hartford to Defend the City of Natchitoches.
The City of Natchitoches at the time of the accident had comprehensive general liability coverage with Hartford.
Hartford was named as a defendant in the main demand and the various third party demands. Hartford denies coverage in its answer to these demands and has asserted that position on appeal. Having determined that the trial court was correct in dismissing all claims against the City and Hartford, the issue of coverage remains only insofar as it affects the issue of duty to defend.
The City, by third party demand, sought attorney's fees from Hartford because Hartford refused to supply a defense.
Hartford takes the position that it is under no duty to defend because the policy unambiguously excludes coverage. Hartford relies on the policy provisions in support of its position.
An endorsement to the policy states:
"It is agreed that suche [sic] insurance as is afforded by the policy excludes injury sickness, disease, death or damage arising out of the existence of highways, roads, streets, sewers (storm or sanitary), sidewalks, culverts, bridges and drawbridges owned or controlled by the named insured."
This endorsement does not clearly exclude coverage in the instant case. The City did not own or actually control the portion of roadway involved in the accident.
Hartford also relies on policy language that states:
"This insurance does not apply
a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to warranty of fitness or quality of the named insured's products or that a warranty that works performed by or on behalf of the named insured will be done in a workmanlike manner."
An "incidental contract" is defined as:
"... any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreements, or (5) elevator maintenance agreement...."
Hartford contends that the petitions of plaintiffs and third party plaintiffs unambiguously exclude coverage because no allegations on the plaintiffs' demands or third party demands were made regarding the breach of warranty that work performed by the named insured was done in a workmanlike manner. We disagree with Hartford's position.
Plaintiffs alleged negligence of the City including:
"2. Failure to make proper maintenance and other work."
The Highway Department, in its third party demand, alleged:
"... Third party defendant [sic] shows that, prior to the date of this accident it had entered into a maintenance agreement with the City of Natchitoches *1312 regarding the section of highway on which this accident occurred, under the terms of which agreement the City of Natchitoches agreed to maintain all the right of way other than actual surfacing of the roadway and agreed to hold the Department of Highways harmless from any and all claims for damages to person or property arising from any negligence attributed to failure to properly maintain any of the facilities assumed by said municipality. (Emphasis ours)

V.
"Under the terms of the said maintenance agreement referred to above, third party defendant the City of Natchitoches, Louisiana is liable to the third party plaintiff for the amount of any judgment which may be rendered in favor of the original plaintiff against the third party plaintiff herein ...."
The rule regarding the insurer's obligation to defend was most recently set out by this court in Michel v. Ryan, 373 So.2d 985 (La.App. 3rd Cir. 1979), writs den., 376 So.2d 319 (La.1979), as follows:
"`Generally, the insurer's obligation to defend suits against its insured is broader than its liability for damage claims. An insurer's duty to defend suits brought against its insured is determined by the allegations of the plaintiff's petition, with the insurer being obligated to provide a defense unless the petition unambiguously excludes coverage.'" (Citations omitted)
"To determine whether the petition `unambiguously excludes coverage,' it is necessary to look to the exclusionary language of the policy itself." (Citations omitted)
As we examine the petition and exclusionary language, coverage is not unambiguously excluded in this case. Hartford contends the petition and third party demands allege nonperformance. We disagree. The petitions alleged liability on the basis of failure to perform properly not just failure to perform. The policy does not exclude coverage of the City for breach of warranty for the City to perform its work in a workmanlike manner. The demands made herein allege improper maintenance which could include work done but not done in a workmanlike manner.
We conclude that the trial court did not err in awarding attorney's fees against Hartford to the City.
The City answered the appeal seeking additional attorney's fees in the amount of $1,000 as a result of its appeal. We find that an additional $750 is a reasonable figure. The award of attorney's fees shall be so increased.
(6) Interest on Attorney's Fees.
The City in its Answer to Appeal contends that the trial court was manifestly erroneous in denying legal interest from date of judicial demand on the attorney's fees.
On the contrary, the trial court was quite correct in denying interest from the date of judicial demand. Alexander v. Burroughs Corporation, 359 So.2d 607 (La.1978). Since the amount of attorney's fees due was not ascertainable until awarded by the court, interest will run only from the date of the judgment.
(7) Tom Elkins' Liability and Reduction of Awards.
Plaintiffs contend on appeal that the trial court erred in finding that Tom Elkins, driver of the other vehicle involved in the accident, was guilty of negligence. Plaintiffs contend that the judgment should not be reduced against the judgment debtors by the virile share of Elkins.
The evidence in the record supports the conclusion of the trial court. Ronnie Brummerloh testified that Tom Elkins had his lights on bright, that he was partially blinded by the lights and that he could not see the center line because of the water on the road. This combination of factors led Brummerloh to direct his car slightly to the right, which resulted in the right wheels falling into the rut and then loss of control. We cannot say the trial court manifestly erred in finding Elkins jointly negligent in *1313 failing to dim his lights as required by statute. LSA-R.S. 32:322 B.[3]
Since we find that only the Highway Department is liable, we must reduce the award against this defendant by one-half. The settlement deprived the Highway Department of its right to enforce contribution of the virile share of Elkins, thus the plaintiffs can recover only one-half (the Highway Department's virile share). Harvey v. Travelers Insurance Company, 163 So.2d 915 (La.App. 3rd Cir. 1964).
(8) Quantum of General Damages.
Plaintiffs contend that the trial court erred in the quantum of general damages awarded each plaintiff.
Mrs. Sherrie Sue Brummerloh's general damages were found to be $100,000. Mrs. Brummerloh suffered severe head injuries, a ruptured bladder, a ruptured liver, fractured pelvis, and facial lacerations.
Following the accident, Mrs. Brummerloh was hospitalized from January 18, 1972 until March 14, 1972. For some time following her discharge, she still required close supervision and care.
Mrs. Brummerloh's internal injuries required surgery. The head injuries also led to a tracheotomy. The operations along with the facial lacerations have left visible, permanent scars.
The injuries to Mrs. Brummerloh's head have left her with some residual disability. For some weeks after the accident, Mrs. Brummerloh was in a comatose or semi-comatose condition. Though she has gradually recovered much of her capabilities, including walking and speaking, the injuries have had a permanent effect. She has lost as much as fifty percent (50%) of the strength in her right arm and leg. She has an unstable gait. She has difficulty with her speech. According to one neuropsychologist who examined her, she will have some difficulty in accomplishing her tasks. She has more difficulty with her memory.
Ronnie Brummerloh's general damages were found to be $3,500 by the trial court. (Additional special damages for medical expenses are not at issue.)
Mr. Brummerloh suffered multiple severe body bruises, a large laceration of the scalp and a laceration of the arm. He was hospitalized for ten days following the accident. The injuries to Mr. Brummerloh were temporary.
Scottie Brummerloh's general damages were found to be $3,000. Scottie was 18 months old at the time of the accident. He was hospitalized for ten days. Scottie suffered multiple body bruises and abrasions, and contracted bronchopneumonia while hospitalized. The child recovered and has no residual problems.
Kimberly Brummerloh's general damages were found to be $2,000. Kimberly had multiple body bruises and abrasions. She had no serious abnormality. Kimberly was hospitalized for two days for observation only.
In the assessment of quantum of damages, much discretion is left to the trier of fact. Such award may be disturbed only if the record clearly reveals an abuse of this "much" discretion. Reck v. Stevens, 373 So.2d 498 (La.1979) and Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
We do not find any abuse of discretion in the amounts awarded to Sherrie Sue, Ronnie, Scottie and Kimberly Brummerloh.
The damages of each of the above was reduced by one-third (1/3) for the reasons heretofore discussed and judgment was rendered accordingly. It will be necessary that the damages to each be reduced by one-half (½) instead of the one-third (1/3), and the judgment will be amended accordingly.
For the reasons assigned herein, the judgment of the trial court insofar as damages is concerned is amended as follows:

*1314 (1) The judgment in favor of Ronnie Brummerloh individually is reduced to the sum of $7,226.29;
(2) The judgment in favor of Ronnie Brummerloh on behalf of the minor Scottie Brummerloh is reduced to $1,500;
(3) The judgment in favor of Ronnie Brummerloh on behalf of Kimberly Brummerloh is reduced to $1,000; and
(4) The judgment in favor of Sherrie Sue Brummerloh is reduced to the sum of $50,000.
The judgment of the trial court as to Louisiana Paving is reversed and set aside and the plaintiffs' suit against Louisiana Paving Company is dismissed.
The judgment of the trial court awarding the City of Natchitoches attorney's fees against Hartford Accident and Indemnity Company is amended by increasing such award by an additional $750. In all other respects, the judgment of the trial court is affirmed. Costs of the appeal are taxed against the State of Louisiana Through the Department of Transportation and Development.
AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART; AND RENDERED.
NOTES
[1] Now the Louisiana Department of Development and Transportation.
[2] Pertinent contract provisions are:

104.04. MAINTENANCE OF TRAFFIC. Reasonable provisions for local traffic throughout the length of the project and the life of the contract must be made by the contractor, at his own expense, during construction.
When required on the plans or in the special provisions the contractor may also be required to provide for through traffic, at his own expense, over the entire project or any designated portion thereof.
If the engineer directs special maintenance for the benefit of the traveling public, then the contractor will be paid therefor at unit prices in the contract or as provided in Subsection 104.03. The engineer will be the sole judge of work to be classed as special maintenance.
105.14. MAINTENANCE DURING CONSTRUCTION. The contractor shall maintain the work during construction and until the project is accepted. This maintenance shall constitute continuous and effective work prosecuted day by day, with adequate equipment and forces to the end that the roadway, or structures are kept in satisfactory condition at all times.
In the case of a contract for the placing of a course upon a course or subgrade previously constructed, the contractor shall maintain the previous course or subgrade during all construction operations.
Except as provided elsewhere in these specifications, all cost of maintenance work during construction and before the project is accepted shall be included in the unit prices bid on the various pay items and the contractor will not be paid an additional amount for such work.
107.07. PUBLIC CONVENIENCE AND SAFETY. The contractor shall at all times so conduct his work as to assure the least possible obstruction to traffic.
When the road under construction is to be kept open for the use of the traveling public, special attention shall be paid to keeping both the subgrade and newly laid surfacing reasonably free from dust and in such condition that the public can travel the road in safety. The safety and convenience of the general public and the residents along the highway and the protection of persons and property shall be a primary responsibility of the contractor.
107.10. BARRICADES AND WARNING SIGNS. The contractor shall provide, erect, and maintain all necessary barricades, suitable lights, danger signals, signs and other traffic control devices, and shall take all necessary precautions for the protection of the work and safety of the public. Highways closed to traffic shall be protected by effective barricades, and obstructions shall be illuminated during hours of darkness. Suitable warning signs shall be provided to properly control and direct traffic.
The contractor shall erect warning signs in advance of any place on the project where operations may interfere with the use of the road by traffic, and at all intermediate points where the new work crosses or coincides with an existing road. Such warning signs shall be constructed and erected in accordance with the plans furnished.
[3] LSA-R.S. 32:322 B provides as follows:

"B. Whenever a driver of a vehicle approaches an oncoming vehicle within 500 feet, such driver shall use a distribution of light, or composite beam, so aimed that the glaring rays are not projected into the eyes of the oncoming driver. The lowermost distribution of light, or composite beam, specified in R.S. 32:321, shall be dimmed to avoid glare at all times, regardless of road contour and loading."