537 So.2d 1283 (1989)
Eva Murrell CARPENTER, Appellant-Appellee,
v.
HARTFORD FIRE INSURANCE COMPANY and Jasper Haddad d/b/a Haddad Maytag Home Appliance Center, Appellees-Appellants.
No. 20233-CA.
Court of Appeal of Louisiana, Second Circuit.
January 18, 1989.
Rehearing Denied February 16, 1989.
*1284 Theus, Grisham, Davis & Leigh by Ronald L. Davis, Jr., Dennis Hennen, Monroe, for plaintiff-appellant-appellee.
Hudson, Potts & Bernstein by Robert M. Baldwin, Monroe, for defendants-appellees-appellants.
Before HALL, MARVIN and JASPER E. JONES, JJ.
MARVIN, Judge.
In this action for damages that arose when a customer fell while exiting an appliance store, both litigants appeal the judgment which assessed plaintiff's fault at 85 percent and thereby reduced the $250,000 in damages determined by the trial court.
Plaintiff contends that she should be allocated no fault or little fault because the "stepdown" exit where she fell constituted a "trap" through which she had to pass to reach the store's parking lot. Plaintiff also seeks to increase general and special damages. The store owner contends the exit did not pose an unreasonable risk of harm to plaintiff in any respect and, in any event, that its fault was minimal and should be reduced to less than 15 percent.
We amend to reduce plaintiff's fault to 50 percent and increase damages for past nursing or sitter care from $10,000 to $27,000. We affirm the judgment as amended.

FACTS
After noon on May 17, 1985, the 71-year-old plaintiff, Mrs. Carpenter, shopped at the Haddad Appliance Center on Louisville Avenue in Monroe for a stove. This was her first visit to Haddad's recently acquired location on Louisville Avenue. She did not buy the stove she selected because she desired to first compare its dimensions with the available space in her kitchen.
As Mrs. Carpenter walked through the north-facing exit door into the bright sunlight, she was momentarily startled by a flash of light that was reflected off of a car traveling on Louisville Avenue. Failing to negotiate the concrete stepdown between the exit door and the sidewalk, she fell and fractured her right leg.
This sketch, in rough scale, depicts the storefront and Mrs. Carpenter's exit route:
*1285 Mrs. Carpenter intended to go to Haddad's customer parking lot east of the store. The step between the exit door and the sidewalk was 5-½ inches and was covered *1286 with red carpet, distinguishing it from both the tile floor of the store and the concrete outside. The storefront facing the sidewalk is plate glass.
After she fell, Mrs. Carpenter told two store employees that the sun had blinded her when she walked out and that she "missed the step." She acknowledged she was in a hurry to get home but not in such a hurry that she was not watching where she was going. Neither store employee saw her fall but one saw her raise her right arm toward the plate glass panel on her right after she had cleared the door and before she fell.
Mrs. Carpenter had worn glasses since having cataract surgery in 1970. She explained that her glasses caused things to look larger to her than they really were, but said she had learned to allow for this. She described her corrected vision as "good" and said she had no problem with depth perception.
Mrs. Carpenter alleged the carpet on the platform presented an unreasonable risk of harm, either because of a small tear near the exit door or because the edge of the carpet nearest the door was not flat or secured by a metal threshold. She alleged alternatively that the one-step platform was hazardous and constituted a defect in the design of the store's exit.
The trial court found that the carpet was not raised or torn but that the exit was defectively designed because it directed customers to the right and required descent at an angle, rather than in a straight line to the sidewalk. The court found that this traffic pattern and Mrs. Carpenter's fall could have been prevented if there had been a handrail to direct an exiting customer in a straight line to the sidewalk and to prevent the customer from walking at an angle toward the northeast corner of the platform.

COMPARATIVE FAULT
The respective duty of each litigant is settled. A store owner must provide customers with passageways that can be negotiated safely with the exercise of ordinary care. A customer must exercise ordinary care for her own safety while on the premises. See Williams v. Aetna Ins. Co., 402 So.2d 192 (La.App. 1st Cir.1981).
The trial court must determine and apportion fault based on factual findings as to the reasonableness of each party's conduct and on the causal connection between that conduct and the injury. We do not disturb factual findings of the trial court unless we can articulate why they are clearly wrong. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La. 1985); Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La.App. 2d Cir.1984).
The trial court heard conflicting expert opinions whether angled customer traffic across the one-step platform at the store's exit was safe. Michael Frenzell, a safety consultant with expertise in slip, trip, and fall accidents, testified that ramps are favored over steps to accommodate changes in elevation of less than 21 inches because slight changes in depth are difficult to perceive. He admitted there was good color contrast between the platform and the surrounding concrete but opined that the step down could still be easily missed because the difference in elevation between the platform and the sidewalk was "only" 5½ inches. He described and demonstrated with photographs that the step is more noticeable for a customer approaching the platform to enter the store than it is for a customer exiting the store.
Frenzell also explained that the entering customer has more time and space to adjust his or her gait to accommodate the step than the exiting customer has. When the customer opens the exit door, the platform edge parallel to Louisville Avenue is only two inches beyond the edge of the fully opened door. Customers tend to veer to the right and away from the door, as shown by wear marks in the carpet, but are afforded only about 31 inches to walk to the narrow edge of the platform on the right. Frenzell said the angular configuration of the storefront also encourages exiting customers to step off the platform to the right instead of moving straight ahead.
*1287 According to Frenzell, descent from the platform at an oblique angle requires greater attention and coordination of a customer than does descent in a line perpendicular to the doorway. He considered the possibility that exiting customers would be confronted with bright sunlight or distracted by traffic on Louisville Avenue to be a factor in the safety of the exit design.
Frenzell opined that the one-step platform made the exit route unsafe because of the combined difficulties of perceiving the slight depth change and of adjusting one's gait to accommodate the stepdown before reaching the edge of the platform. As a remedy, he suggested that handrails or large planters could be placed to direct customers to walk at a right angle and not obliquely, or that enlarging the concrete stepdown would provide exiting customers more options for and control over their descent.
Obviously anticipating defense testimony that the store exit complied with applicable building codes, Frenzell testified that the main purpose of the codes is to provide minimum safety standards for emergency exits from buildings. Frenzell said that minimal compliance with the building codes does not necessarily make an exit safe for everyday use by the public.
The defense expert, Jerry Mack Madden, a Louisiana-licensed engineer, civil surveyor, architect, and building contractor, was accepted as having specific expertise in the design and construction of entrances to commercial and residential buildings.
Madden testified that the applicable building code for the city of Monroe allows the use of single steps to accommodate changes in elevation of eight inches or less between indoor and outdoor surfaces. The code requires that the landing be wider than the door, as this landing was. Madden described the additional landing space to the east or right of the exit door as exceeding code requirements. He said the landing would meet code requirements even if it had no carpet on it, and opined that the red carpet provided adequate warning of the step to store customers. He disagreed with Frenzell's opinion that the pattern of angled descent from the platform to the sidewalk made the exit unsafe.
Madden did not consider a ramp to be feasible because code regulations as to the size of the ramp would place it too far into the sidewalk. He also felt planters or handrails to direct customers toward the sidewalk in a straight line would be inappropriate because of the proximity of Louisville Avenue. He said he had never seen a handrail used at any landing similar to this one.
We give the usual deference to the trial court's assessment of conflicting expert testimony. Here the trial judge visited the store and observed the stepdown. The court's finding that the design of the exit presented an unreasonable risk of harm to a customer exiting the store is supported by the record and is not clearly wrong. See and compare Williams v. Aetna Ins. Co., supra, and Waters v. McDaniel Recreation Center, 521 So.2d 788 (La. App. 2d Cir.1988), writ denied.
The record also supports the court's findings that Mrs. Carpenter failed to exercise due care when she was leaving the store and that her fall was caused by the combination of the exit design and her own conduct. We cannot agree, however, on this record, with the trial court's finding that because Mrs. Carpenter was in a hurry and failed to see what she should have seen she was 85 percent at fault.
Mrs. Carpenter admitted she was in a hurry to get home to tend to her sick brother when she was leaving the store. The trial court apparently discounted her explanation that she was still "watching" where she was going. She said she stood still for "just a second" when she encountered the bright sunlight and the flash of reflected light from a passing car. She said she held onto the door until her eyes began to adjust to the outdoor light, and then resumed walking:
I stepped out first with my left foot ... My right foot, I couldn't move it ... It just hung on me. Just hung on something or I couldn't move that right foot.
*1288 And I got overbalanced and I fell to the right.
After Mrs. Carpenter stepped through the doorway, a store employee saw her raise her right arm toward the plate glass in a "pretty slow motion." He said she was walking "real slow." No one else saw her as she was leaving the store. After she fell, she told two store employees that the sun blinded her and she "missed" or "didn't see" the step.
Notwithstanding Mrs. Carpenter's initial desire to get home quickly, she paused at the door when confronted with the bright outdoor light, she was walking slowly as she crossed the platform, and she tried to support herself on the plate glass at the storefront when she resumed walking toward the parking lot. The store employee corroborated her general movement, stating that her arm movement was a "pretty slow motion." The preponderance of the evidence does not show that Mrs. Carpenter was proceeding in great haste and in total disregard of her own safety. Nonetheless, we agree she failed to use ordinary care by proceeding in some haste with less than a careful observation after being temporarily blinded.
When we find a trial court's assessment of fault to be too high, we reduce it to the highest percentage we would have affirmed as reasonably within the trial court's discretion. Finley v. North Assur. Co. of America, 476 So.2d 837 (La.App. 2d Cir.1985). On this record, and considering the nature of each party's conduct and the causal connection between the conduct and the injury as we are directed to do by Watson, supra, we must find clearly wrong the trial court's finding that Mrs. Carpenter's fault was more than five times greater than the fault of the store owner. Her fault should not exceed that of the store owner on this record, especially because the store owner should have known of the angled exit pattern of the customers. We shall amend the judgment to allocate fault equally between plaintiff and the store owner.

QUANTUM
Mrs. Carpenter had a displaced or fragmented Y-shaped fracture of the right femur just above the knee. Her orthopedist also found large fragments of bone in her knee joint. He repaired the fracture with a metal plate held in place by screws in the femur and in the knee joint. The fracture healed well, but Mrs. Carpenter developed other complications from the surgery and spent 2½ months in the hospital.
Mrs. Carpenter had diabetes which was controlled with medication and did not restrict her activities before the fall. Her immobility in the hospital changed her metabolism which required monitoring by her internist. She had recurrent bowel and urinary tract infections in the hospital and twice spent several days in the intensive care unit. The infections were caused by the combination of catheter use, required after surgery, and peripheral neuritis, a diabetes-related condition that affected her bladder and colon.
Before her fall Mrs. Carpenter was an active person in good health. Widowed since 1982, she lived with and took care of her brother, who had had a stroke and could not take care of himself. She did all the shopping, cooking, housework, and yardwork.
After the fall, Mrs. Carpenter cannot stand or walk without assistance. She has developed arthritis in her right knee, as her orthopedist expected, because of the severity of the fracture into her knee joint at age 71. Walking with a walker becomes increasingly painful and difficult. Her arthritic knee is expected to get worse. Surgery may be required to remove the hardware used to repair the fracture or to insert an artificial knee joint. Because of Mrs. Carpenter's condition her orthopedist considers either form of surgery to carry significant risks. He estimated that a total knee replacement would cost $15,000-$20,000.
Mrs. Carpenter last saw her orthopedist about six months before trial. During that six months he refilled prescriptions for her arthritis medicine by telephone.
*1289 Mrs. Carpenter saw her internist about six weeks before trial. He gave this prognosis:
[P]rior to the accident, she was doing fine with her normal vital functions. As a result of her accident in which she had to be bedridden, she had ... severe complications during her hospitalization. She has gotten over the majority of these complications. She still has trouble with her bladder. She still has some intermittent bouts of nausea. She still has some trouble with constipation. But, this is due to her progressive deterioration of her diabetic vascular condition, which I don't think had anything to do with the accident.
The internist testified that Mrs. Carpenter will need constant nursing care at home for the rest of her life. There was no testimony about her specific life expectancy.
While Mrs. Carpenter was in the hospital, her brother stayed in a nursing home. He returned home when she did, and she paid a live-in sitter $1,000 per month to care for them. The sitter stole or embezzled Mrs. Carpenter's savings and left in June 1986. Mrs. Carpenter's brother died two months later.
Since early July 1986, Mrs. Carpenter has been unable to pay her friend, Geneva Streeter, who has stayed with and cared for her at no charge. If she cannot stay with Mrs. Carpenter overnight, Mrs. Streeter pays someone else $50 to stay with her from 5:00 p.m. until 8:00 a.m. the next day. Mrs. Streeter pays $25 to the substitute sitter for daytime care. These payments average $150 per month. Mrs. Streeter also runs errands and obtains prescription drugs for Mrs. Carpenter. Mrs. Carpenter spends an average of $317 monthly on prescription drugs.
Mrs. Carpenter testified she desires, but is financially unable, to pay Mrs. Streeter $1,000 per month, the amount she paid the thieving sitter.
Mrs. Carpenter has had constant pain in her leg since the fall. After she began walking with a walker, she developed bursitis in her shoulder. She had nerve palsy that caused muscle weakness in her feet for about nine months. Someone has to walk behind Mrs. Carpenter when she uses the walker because she tends to fall backward. She cannot get in or out of bed or use her bedside commode without help. She cannot feed or bathe herself. She described her frustration and difficulty of adjusting to her state of total dependence after being physically and financially independent before her accident.
The trial court made these damage awards, to be reduced by Mrs. Carpenter's percentage of fault:

$170,000 General damages
 32,442 Past medical expenses
 6,023 Past drug expenses
 10,295 Past sitter expenses
 10,000 Future medical expenses
 25,000 Future home care and/or
 drugs

Mrs. Carpenter seeks an increase in the awards for general damages, past and future sitter expenses, and future medical care. The store owner contends the general damage award is adequate and seeks to reduce or reverse the awards for future sitter, drug and medical expenses.
The trial court heard detailed evidence of Mrs. Carpenter's condition and found that she suffered "a tremendous disabling injury." Both litigants briefed the general damage issue in the trial court and cited the same comparative quantum cases they cite on appeal. From our review and summary of the evidence, we find no articulable basis for saying the trial court abused its great discretion in setting the general damage award, which we do not disturb. Reck v. Stevens, 373 So.2d 498 (La.1979).
The parties stipulated that Mrs. Carpenter spent $10,245.98 for home care through May 1986.[1] Trial was held on December 1 and 2, 1987, about 30 months *1290 after the fall. Although Mrs. Carpenter was not able to pay Mrs. Streeter for home care during this time, she should recover a reasonable amount for the gratuitous services if the services are shown to have been necessary. Bordelon v. Aetna Cas. & Sur. Co., 494 So.2d 1283 (La.App. 2d Cir. 1986).
The medical testimony establishes Mrs. Carpenter's need for constant home care. We shall amend the judgment in this respect. She testified she would have continued paying $1,000 monthly for home care after May 1986 if she could have afforded it. This amounts to about $233 per week, or $33 per day, well within the range of $25 per day and $50 per night that Mrs. Streeter paid others to stay with Mrs. Carpenter.
We cannot say $1,000 per month is an unreasonable amount for the 17 months of needed care that Mrs. Streeter provided from July 1986 until trial. We increase the award for past sitter expenses from $10,245.98 to $27,245.98. Bordelon, supra.
Although Mrs. Carpenter will need home care for the rest of her life, the record does not specifically show her life expectancy. Nor does it show how long she is expected to continue spending over $300 monthly for drugs. Having found $1,000 per month to be a reasonable amount for home care, we do not find the $25,000 award for both future home care and future drug expenses is either inadequate or excessive.
The only testimony about future medical care related to the fall came from the orthopedist, who said it would cost between $15,000 and $20,000 for a total knee replacement, one of the options that would be considered if Mrs. Carpenter's arthritis in the joint worsens as the orthopedist expects it to. The trial court's $10,000 award for future medical care is neither abusively high nor abusively low and is within the trial court's discretion. See and compare Cushman v. Fireman's Fund Ins. Co., 401 So.2d 477 (La.App. 2d Cir.1981), and LeBleu v. Dynamic Indus. Constructors, 526 So.2d 1184 (La.App. 3d Cir.1988), writ denied, 528 So.2d 154 (La.1988).

DECREE
We amend the judgment to increase the award for past sitter expenses to $27,245.98, and to assess Mrs. Carpenter and the store owner with 50 percent fault each. In all other respects, the judgment is affirmed at the cost of defendant.
AS AMENDED, AFFIRMED.

ON APPLICATION FOR REHEARING
Before HALL, MARVIN, JASPER E. JONES, FRED W. JONES and HIGHTOWER, JJ.
Rehearing denied.
NOTES
[1] Two of the numbers were transposed in the judgment, which awarded $10,295.48. We shall use the correct figure.