576 So.2d 85 (1991)
Clarice L. ROBERTS, Plaintiff/Appellant/Appellee,
v.
STATE of Louisiana, Through the DPARTMENT OF TRANSPORTATION AND DEVELOPMENT and L.J. Earnest, Inc., Defendants/Appellants/Appellees.
No. 22181-CA.
Court of Appeal of Louisiana, Second Circuit.
February 27, 1991.
Rehearing Denied March 28, 1991.
Writ Denied June 14, 1991.
*86 Peters, Ward, Bright & Hennessy by J. Patrick Hennessy, Shreveport, for plaintiff/appellant/appellee, Clarice L. Roberts.
Lunn, Irion, Johnson, Salley & Carlisle by Charles W. Salley and James A. Mijalis, Shreveport, for defendant/appellant/appellee, State of La., Through the Dept. of Transp. and Development.
Campbell, Campbell & Johnson by John T. Campbell, Minden, for defendant/appellee, L.J. Earnest, Inc.
Before SEXTON, LINDSAY and BROWN, JJ.
SEXTON, Judge.
Defendant, the State of Louisiana, through the Department of Transportation and Development (DOTD), appeals the trial court judgment awarding the plaintiff, Clarice Roberts, $295,674.83 in damages suffered as the result of an automobile accident and rejecting DOTD's third party demand against L.J. Earnest, Inc. (the contractor). The plaintiff has also appealed, seeking review of a summary judgment which dismissed plaintiff's claims against the contractor and its insurer, First Horizon Insurance Company.[1] We affirm in part, reverse in part, and amend in part.
The automobile accident at issue occurred on La. Highway 3 in Bossier Parish. On the date of the accident, December 24, 1986, DOTD was in the process of having La. 3 converted from a two-lane highway into a four-lane highway. DOTD had contracted with L.J. Earnest, Inc. to perform the necessary work. Plans called for the contractor to initially construct two new lanes, during which time traffic would continue on the original lanes of La. 3. When the new lanes of travel were completed, traffic would be rerouted onto the new lanes while the contractor upgraded the old lanes. On the date of the accident, the contractor was still working on the new lanes of La. 3. Only minor work had been done on the old lanes of La. 3, such as the installation of drainage pipes at periodic locations under the highway. Pursuant to DOTD's specifications, the contractor had erected various signs along La. 3 noting that it was under construction.
Additionally, the contractor had erected "low shoulder" signs every three-fourths mile along the construction project. These signs were erected in response to a December 9, 1986, conversation between Wayne *87 Conley, an engineering specialist with the DOTD and supervisor of the DOTD's inspectors for the La. 3 project, and representatives of the contractor. Mr. Conley had informed the contractor that maintenance was necessary to repair edge ruts which had developed between the edge of the paved highway and the unimproved shoulder. Although the depth of these edge ruts, three to five inches, would have dictated their repair based upon DOTD regulations, repair was not then undertaken because it was apparently determined that inclement weather had made the shoulders too wet to allow effective repair. Instead, the contractor put up the "low shoulder" signs. The edge ruts were eventually repaired by the contractor on January 7, 1987.
At approximately 11:45 a.m. on December 24, 1986, the plaintiff was driving in the southbound lane of La. 3, approximately two miles south of Benton, heading toward Bossier City. It should be noted that the new lanes were being constructed adjacent to the northbound lane of the then La. 3. The plaintiff had traveled this same road both to and from work four days a week since she had begun to work in Benton, three weeks previously. Although the plaintiff does not remember the accident, eyewitness testimony reveals that the plaintiff's passenger side tires strayed off the roadway and into a water-filled edge rut. From some apparent combination of the jolt caused by the vehicle hitting the rut, the plaintiff's immediate, abrupt and apparently purely instinctive turning of the steering wheel, and the reduced friction between the tires and the ground caused by the water in the edge rut, the plaintiff's vehicle was, in effect, thrust back onto the highway, across the center line, and into a northbound vehicle being driven by Mildred Davis Jones. The plaintiff suffered a compound fracture of the left femur, a concussion, and lacerations to her face as a result of the accident.
The plaintiff filed suit against DOTD and L.J. Earnest, Inc., alleging the defendants were negligent and/or strictly liable for failure to properly maintain the shoulder of the highway and for failure to warn of its dangerous condition. The petition was later amended to add as a defendant First Horizon Insurance Company, the insurer of L.J. Earnest, Inc. Third party demands were filed by each defendant against the other. DOTD alleged that L.J. Earnest, Inc. owed indemnification or contribution pursuant to the contract between the parties.
L.J. Earnest, Inc. and its insurer filed motions for summary judgment against the plaintiff on the main demand and against DOTD on the third party demand. The trial court found there was no dispute that the contractor had not yet begun construction on the original two lanes of La. 3 and therefore could not be liable in tort to plaintiff. Summary judgment for the contractor on the original demand was therefore ordered. Summary judgment was denied on the third party demand, as the trial court found that demand involved a contractual dispute, as to which there remained genuine issues of material fact.
A bench trial was had on the remaining issues. In a written opinion, the trial court found that DOTD was solely responsible for the accident and the plaintiff's damages, which were found to total $295,674.83. The trial court found DOTD had the duty to maintain the highway shoulder and that this duty encompassed the risk that a driver would be injured by inadvertently straying onto the defective shoulder. The court found DOTD knew of the existence of the edge ruts and failed to adequately correct the problem, thereby breaching its duty to the plaintiff. The plaintiff was found not to be at fault in the accident as the trial court found she could not have known of the edge ruts. Nor was the plaintiff negligent in her instinctive reaction, abruptly turning the steering wheel, after hitting the edge rut. Additionally, the trial court found that the contractor was not liable on the third party demand under its contract with the DOTD as the trial court found the contractor had strictly complied with all of DOTD's requests regarding the construction project. A judgment ordering DOTD to pay all of plaintiff's *88 damages was thereafter prepared and signed.

LIABILITY OF DOTD AND L.J. EARNEST, INC.
The DOTD has a duty to keep the state's roadways and their shoulders in a reasonably safe condition. Whether the DOTD has breached that duty, i.e., whether the roadway and shoulder at the scene of the accident were in an unreasonably dangerous condition, will depend on the particular facts and circumstances of each case. Holloway v. State Department of Transportation and Development, 555 So.2d 1341 (La.1990); Manasco v. Poplus, 530 So.2d 548 (La.1988).
A motorist has a right to assume that a highway shoulder, the function of which is to accommodate motor vehicles intentionally or unintentionally driven thereon, is maintained in a reasonably safe condition. Rue v. State, Department of Highways, 372 So.2d 1197 (La. 1979). An implicit necessity for the functional use of a shoulder is a connection between the roadway and the shoulder that allows for safe, gradual movement from one to the other. Sinitiere v. Lavergne, 391 So.2d 821 (La. 1980).
In the instant case, the connection between the paved roadway of La. 3 and the unimproved shoulder was disrupted by the three- to five-inch edge ruts. These edge ruts defeated, or at least obstructed, the functional use of the shoulder. The edge ruts prevented the safe use of the shoulder of La. 3 and constituted an unreasonably dangerous condition. The edge rut which the plaintiff entered on the date of the accident was especially dangerous as it was at least partially filled with water. This made the depth and also the mere existence of the edge rut difficult to determine from the roadway. It also reduced friction between a tire which entered that edge rut and the ground.
There is little doubt that the edge rut was a cause of the accident. The jolt caused by the plaintiff's entering the rut, together with the reduced frictional coefficient caused by the water in the rut and the plaintiff's apparently instinctual, abrupt turning of the wheel caused her to reenter the highway and strike the oncoming vehicle driven by Mildred Jones.
The issue of the DOTD's liability in this case is complicated by the existence of the construction contract with L.J. Earnest, Inc. The contract between DOTD and L.J. Earnest, Inc. provided that the contractor was to maintain the area under construction and to provide for the continuation of traffic during the entirety of the construction project. This necessarily envisioned that the contractor, not the DOTD, would be responsible for the maintenance of the roadway and shoulders of the original lanes of travel of La. 3 during the construction of the two new lanes of travel.
However, notwithstanding a contrary arrangement with a contractor, the DOTD may not contract away its responsibility as to the general public to maintain the highways and their shoulders in a reasonably safe condition; this duty is non-delegable. Guillotte v. Department of Transportation and Development, 503 So.2d 618 (La.App. 4th Cir.1987); Robinson v. State Department of Transportation and Development, 454 So.2d 257 (La.App. 1st Cir.1984), writ denied, 458 So.2d 122 (La.1984); Hardy v. State, Department of Highways, 404 So.2d 981 (La.App. 3rd Cir. 1981), writs denied, 407 So.2d 741 (La. 1981). DOTD thus remains liable to the plaintiff.
Nevertheless, the contractor was primarily negligent in failing to properly repair the edge ruts. By the construction contract with DOTD, L.J. Earnest, Inc. undertook the responsibility of maintaining the shoulders of La. 3 during the term of the construction project. Wayne Conley of the DOTD timely informed the contractor of the edge ruts and urged their repair. Although the contractor erected "low shoulder" signs, repair of the edge ruts was not undertaken until after the accident.
The erection of the warning signs does not in and of itself absolve the contractor of liability. Warning signs may lessen a *89 hazard but they do not correct or eliminate the hazard. There exists a duty to resolve a hazard created by construction activity within a reasonable time and not to expose the motoring public to dangers which could be prevented by the use of reasonable and ordinary care. What constitutes a reasonable time to complete construction and eliminate defects depends upon the circumstances of each case. Brandon v. State, Department of Highways, 367 So.2d 137 (La.App. 2d Cir.1979), writ denied, 369 So.2d 141 (La. 1979).
Considering all of the circumstances which we have previously noted, we conclude that the failure to repair these edge ruts was not reasonable, and the contractor was therefore negligent. We do, however, consider the erection of the "low shoulder" signs in the apportionment of fault.
It should be noted that this was not a case where a drop off (as opposed to an edge rut) was intentionally created because it was necessary to do so in connection with an ongoing construction project. In such a case where, for example, the roadway is temporarily elevated or the shoulder temporarily excavated, the duty on the state to maintain the shoulders is relaxed and may be satisfied by adequate warnings rather than prompt repair. Golden v. Madden Contracting Company, Inc., 469 So.2d 1039 (La.App. 2d Cir.1985), writ denied, 475 So.2d 363 (La.1985); Booth v. Potashnick Construction Company, 420 So.2d 512 (La.App. 2d Cir.1982), writ denied, 423 So.2d 1183 (La. 1982).
In fact there was evidence that the presence of the construction vehicles on the original lanes of La. 3 either caused or contributed to the existence of the edge ruts. Louisiana State Police Trooper Steve Porter testified that, in his opinion as a frequent traveler on La. 3, the ruts may have been caused by other vehicles dropping onto the shoulder in order to pass construction vehicles which would slow to turn into the construction areas.
It should likewise be noted that this case is distinguishable from the pre-comparative case of Brummerloh v. Firemen's Insurance Co. of Newark, N.J., 377 So.2d 1301 (La.App. 3rd Cir.1979), relied upon by the trial court in granting L.J. Earnest, Inc.'s motion for summary judgment. In Brummerloh, as in the instant case, the government authority contracted with a third party to convert a state highway from a two-to a four-lane road, and the contract called for the contractor to maintain the shoulders of the road. While the contractor was building the two new lanes, traffic continued on the original lanes of the highway, where the plaintiff, Brummerloh, was involved in an accident caused by ruts along the highway. The appellate court refused to impose any liability on the part of the contractor as it had not yet begun work on the old highway where the accident occurred.
However, in Brummerloh, the evidence showed that the contractor had not had any equipment on the existing lanes of the highway and had never been requested by the governmental authority to perform maintenance on the shoulders of the original highway. Importantly, the ruts had been there for a "long time" and apparently existed prior to the construction contract. In the instant case, the evidence shows that construction vehicles of the contractor had traveled on the original lanes of La. 3 to reach their work site and, most importantly, DOTD had noted the existence of the edge ruts and had requested that the contractor remedy those edge ruts in accordance with its contractual responsibility. Also, there was no evidence the instant ruts existed prior to the construction contract.
The contractor's negligence in failing to repair the edge ruts is thus based on LSA-C.C. Art. 2315. DOTD's liability stems from LSA-C.C. Art. 2317, a strict liability as custodian of the state's highways. DOTD's breach of its Art. 2317 duty and L.J. Earnest, Inc.'s breach of its Art. 2315 duty combined to produce, in solido, responsibility for the plaintiff's damages. Robinson v. State Department of Transportation and Development, supra (Shortess, *90 J., concurring).[2]See also, Whitney v. State, Department of Transportation and Development, 540 So.2d 970 (La.App. 2d Cir. 1989), where the DOTD was found strictly liable under LSA-C.C. Art. 2317 for the condition of a highway manhole cover which gave way when driven over by the plaintiff.[3] The trial court was clearly wrong in the instant case in not finding L.J. Earnest, Inc. liable.

INDEMNITY
The DOTD seeks indemnity from L.J. Earnest, Inc. for any damages the DOTD is obligated to pay the plaintiff. In support of their claim of entitlement to indemnification, DOTD cites the following clause of the Louisiana Standard Specifications for Roads and Bridges (1982 ed.), which was specifically adopted as part of the contract between the DOTD and the contractor. That clause provides, in pertinent part:
107.18 DAMAGE CLAIMS. The contractor shall indemnify the Department, its officers and employees from all suits, actions or claims brought because of injuries or damage sustained by any person or property on account of operations of the contractor; or on account of negligence in safeguarding the work; or through use of unacceptable materials in constructing the work; or because of any negligent act, omission or misconduct of the contractor....
We note that this almost identical indemnity clause was held to enable the DOTD to recover indemnity from a contractor in Robinson v. State Department of Transportation and Development, supra. Here, as discussed earlier, the liability of the DOTD is based on a theory of strict liability, not negligence.[4] LSA-R.S. 38:2216(E) implicitly allows indemnity in cases of strict liability. Jones v. Merrick Construction Company, 546 So.2d 928 (La.App. 3rd Cir.1989), writ denied, 551 So.2d 631 (La.1989). The DOTD seeks indemnity for the damages it is obligated to pay, which damages we have determined were caused by the negligence of the contractor. The indemnity provisions of the contract are applicable and L.J. Earnest, Inc. is required to indemnify the DOTD for the damages DOTD must pay to the plaintiff.

PLAINTIFF'S LIABILITY
DOTD and the contractor both argue that the trial court's finding that the plaintiff was free of negligence in the accident is manifestly erroneous. We agree.
We note that several precomparative negligence cases held that a motorist who inadvertently strayed off the paved surface of a highway onto a defective shoulder, who then instinctively swerved back onto the highway, but lost control of the vehicle, was not barred by contributory negligence from recovery for injuries sustained in a resulting accident. See LeBlanc v. State, 419 So.2d 853 (La.1982); Rue v. State, Department of Highways, supra. However, since the advent of comparative negligence, LSA-C.C. Art. 2323, notwithstanding the negligent maintenance of a highway shoulder, a driver who strays onto a defective shoulder has been almost consistently found to be proportionally at fault in a resulting accident. Rochelle v. State, DOTD, 570 So.2d 13 (La.App. 3rd Cir.1990), writ denied, 572 So.2d 93 (La.1991); Brooks v. City of Baton Rouge/Parish of East Baton Rouge, 558 So.2d 1177 (La. App. 1st Cir.1990), writ denied, 566 So.2d 982 (La.1990); Cashio v. State, Department of Transportation and Development, 518 So.2d 1063 (La.App. 1st Cir. 1987); Motton v. Travelers Insurance Company, 484 So.2d 816 (La.App. 1st Cir. *91 1986). But see, Wall v. Alleman, 519 So.2d 155 (La.App. 2d Cir.1987), writ denied, 521 So.2d 1171 (La.1988).
In the instant case, even assuming we can confidently rely on the continuing validity of the precomparative cases, we find the plaintiff was also negligent, and her negligence was a proximate cause of the accident. As stated in another pre-comparative case decided by the Louisiana Supreme Court:
[I]f a person is chargeable with knowledge of a shoulder defect that could cause serious injury and, nevertheless, disregards his own safety and the safety of others, the law considers his actions in leaving the main travel portion of the roadway to be a breach of his duty to himself and to the others who can reasonably be expected to be injured by his actions.
Sinitiere v. Lavergne, supra at 826.
Here, Mrs. Roberts must be charged with knowledge of the edge ruts in the shoulder. She had traveled La. 3 twice daily for the three weeks preceding the accident and was aware that construction was ongoing in the area. A review of the photographs entered into evidence shows that these edge ruts should have been visible to a reasonably observant motorist. Although some of the ruts were perhaps partially filled with water, these ruts extended for a significant distance along the side of La. 3. Perhaps most importantly, there were several construction and "low shoulder" signs along La. 3.
Plaintiff argues that the "low shoulder" signs were insufficient to notify her of the edge ruts, pointing out that edge ruts are technically a different problem than a low shoulder. This argument is unconvincing. The accident happened at noon on a relatively straight portion of the roadway. Plaintiff had frequently traveled the area and was aware of the construction activity in progress. Most importantly, the "low shoulder" signs warned motorists that the shoulders were in some way substandard and should have functioned to alert drivers to be especially attentive to remain on the paved portion of the highway, regardless of whether the shoulder was defective because it was a low shoulder or because it contained edge ruts. The plaintiff's straying onto the shoulder under these circumstances was clearly negligent and contributed to the accident. The trial court's contrary finding was clearly in error.

APPORTIONMENT OF FAULT
As we have found all parties at fault in this accident, we must determine the percentage of fault of each. LSA-C.C. Art. 2323. This apportionment is guided by the principles enunciated in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La. 1985):
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Our consideration of these factors convinces us that the degree of fault rests evenly between the plaintiff on the one hand and the DOTD and the contractor, in solido, on the other. We note that the plaintiff's negligence was caused by her inadvertence.[5] The actions of the DOTD *92 and the contractor constituted a more active, intentional form of conduct. They were aware of the edge ruts, which, according to DOTD's own regulations, should have been repaired. Due to the wet weather conditions, the ruts were not immediately repaired, but "low shoulder" signs were erected. The "low shoulder" signs did reduce the risk that a motorist would stray into the edge ruts. These warning signs should have served to reduce a reasonably prudent motorist's inadvertence and increased the motorists' awareness of the danger of straying onto the shoulder.
After weighing the appropriate factors, we apportion 50 percent of the fault in this accident to Ms. Roberts, and the remaining 50 percent of the fault is apportioned to the DOTD and L.J. Earnest, Inc., in solido. Because of the nature of the liability of the two defendants, one being in negligence and the other in strict liability, it is unnecessary that we apportion the fault among the defendants.

QUANTUM
The trial court awarded the plaintiff $295,674.83 total damages. This constituted $16,000.00 in lost wages, $17,674.83 in past medical expenses, $12,000.00 in future medical expenses, and $250,000.00 in general damages. DOTD and L.J. Earnest, Inc. argue that the award for lost wages and the general damage award are excessive and an abuse of the trial court's discretion.
Considering first the general damage award, our initial inquiry is whether the trial court's $250,000.00 award for the injuries and their effects upon Ms. Roberts constituted a clear abuse of the much discretion accorded to the trier of fact. Only after a determination of an abuse of discretion has been made, may we resort to a consideration of awards in other similar cases to determine an appropriate award in the instant case. Reck v. Stevens, 373 So.2d 498 (La.1979); Wactor v. Pickens Lumber Company, 505 So.2d 815 (La.App. 2d Cir. 1987), writ denied, 508 So.2d 827 (La. 1987).
Following the accident, the 61-year-old plaintiff was taken to the Bossier Medical Center where she was seen by an orthopedic specialist, Dr. Thomas Edwards. The plaintiff had suffered a concussion and lacerations on her lip and chin. Her most serious injury involved a compound, comminuted fracture of her left femur. The injury actually involved three fractures of the left femur, two of which extended into the knee joint. Additionally, the lateral condyle, the outside notch on the lower end of the femur, had been sheared off. The plaintiff was immediately operated on by Dr. Edwards, who inserted three screws and a screw plate into the bone.
The plaintiff remained in the hospital for approximately two weeks, from December 24, 1986, until January 7, 1987. When the plaintiff was discharged, she had to use a walker and could not move her knee for four weeks. On January 23, 1987, Dr. Edwards fitted the plaintiff with a hinged knee splint to allow movement of the knee. On March 10, 1987, Dr. Edwards discontinued use of the splint, but the plaintiff was only allowed to put balancing, and not full weight, on the leg. On April 7, 1987, the plaintiff was allowed to put full weight on the leg and to walk with a cane. On May 19, 1987, the plaintiff was doing much better, but still did not have full flexion or extension of the knee. When Dr. Edwards next saw the plaintiff, on July 14, 1987, the plaintiff was experiencing pain, probably from the screws in her leg. In September 1987 a second surgery was performed to remove the screws, and the plaintiff then spent two days in the hospital, from September 14 to September 16, 1987. By October 1987 the plaintiff could walk without the cane. Dr. Edwards last saw the plaintiff in January 1988 and, although she was still experiencing pain, she was doing well.
*93 Dr. Edwards estimated that the plaintiff has about a 25 percent disability to her leg. She is unable to stand for prolonged periods of time, or to stoop, squat, or climb stairs. In Dr. Edwards' opinion, the plaintiff now has a higher likelihood of arthritic problems as she gets older and is already showing signs of traumatic arthritis. She will possibly require occasional cortisone injections, arthroscopic debridement, and possibly a joint replacement. The plaintiff testified that she still must occasionally use her cane. She still has pain from the injury and takes nonprescription pain relievers every day or every other day. The trial court, in its written opinion, noted that the plaintiff had difficulty taking the witness stand and appeared to be in physical discomfort throughout the trial.
Ms. Roberts has suffered a very severe injury to her left leg which will apparently continue to give her pain and preclude her from activities she was able to perform prior to the injury. Nevertheless, we find that the $250,000 general damage award is excessive and an abuse of the trial court's discretion. Our review of other similar cases is tempered by the proviso that, as we have found that the trial court abused its discretion in awarding an excessive amount of damages, we must lower the award of general damages to the highest amount we find the trial court could have reasonably awarded. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976); Wactor v. Pickens Lumber Company, supra. We therefore will consider other similar cases to determine an appropriate award.
We have found four cases which we consider to involve similar injuries, but are careful to note the differences between the injuries and their effects on the plaintiffs in each case. In Smith v. Roussel, 554 So.2d 776 (La.App. 5th Cir.1989), writ denied, 559 So.2d 141 (La. 1990), the appellate court affirmed an $8,000 general damage award. The plaintiff had been cut over the left eye, leaving a scar, had suffered multiple bruises, a concussion, and a comminuted fracture of the leg. The plaintiff had surgery, was hospitalized 17 days, wore a cast for five months, and was on crutches for six months. However, unlike the instant case, the plaintiff suffered no continuing disability; at discharge from treatment, the plaintiff had no limp, no impairment of the injured leg, and no further pain.
In Coleman v. Jackson, 422 So.2d 179 (La.App. 3rd Cir.1982), the appellate court awarded $40,000 in general damages to a 25-year-old plaintiff who suffered a comminuted fracture of the right femur. The plaintiff spent 48 days in a hospital in traction and had a metal pin inserted in the bone. For two and one-half months following his hospital discharge, the plaintiff wore a cast brace and needed crutches to ambulate. The plaintiff's injured leg was found to have been shortened by three centimeters. The plaintiff had a 30 percent disability to the leg and a 12 percent disability to the body as a whole. We note that the court specifically found that the evidence showed that, due to the plaintiff's young age and the fact that the injury did not occur in a joint, the plaintiff's chances of developing arthritis had not increased.
In Carpenter v. Hartford Fire Insurance Company, 537 So.2d 1283 (La.App. 2d Cir.1989), this court affirmed a $170,000 general damage award for a 71-year-old plaintiff who suffered a displaced, or fragmented, Y-shaped fracture of her right femur just above the knee; large fragments of bone were found in her knee joint. Although the fracture healed well, the plaintiff suffered other complications from surgery involving infections and complications from her preexisting diabetic condition, and she ultimately spent two and one-half months in the hospital. The plaintiff was unable to stand or walk without assistance, had developed arthritis, experienced pain while walking with a walker, faced possible knee replacement surgery, and needed constant nursing care. We note that the plaintiff in the instant case suffered neither immediate nor long-term complications to the degree of the plaintiff in Carpenter.
Finally, in Soulier v. Highlands Insurance Company, 517 So.2d 355 (La.App. 5th Cir.1987), the appellate court affirmed a *94 $200,000 general damage award for a 39-year-old plaintiff who suffered a comminuted fracture of the patella, chest contusions and abrasions, and a nasal fracture. The plaintiff had surgery and was hospitalized for ten days. The plaintiff suffered continuing weakness, loss of motion and pain in the leg, and a 25 percent disability was assigned. The plaintiff was unable to do repetitive bending, stooping, crawling, squatting, lifting, or climbing and therefore was unable to return to his carpentry job. We note that the relative youth of the plaintiff in Soulier compared to Ms. Roberts would likely entail a greater number of years of pain and discomfort for the plaintiff in Soulier.
In light of our finding that the $250,000 general damage award is excessive and considering the aforementioned jurisprudence, we conclude that the highest appropriate award for Ms. Roberts' general damages is $150,000. The trial court's general damage award will therefore be amended in this regard.
DOTD and L.J. Earnest, Inc. also argue that the award of $16,000 in lost wages was excessive. Awards for lost future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Courts must exercise sound judicial discretion in determining these awards and render awards which are consistent with the record and which do not work a hardship upon either party. Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 522 So.2d 1144 (La.App. 2d Cir.1988); Higginbotham v. Ouachita Parish Police Jury, 513 So.2d 537 (La.App. 2d Cir.1987).
Factors to be considered in determining a proper award for lost future income are the plaintiff's physical condition before injury, the plaintiff's past work history and consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages the remainder of her working life. Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, supra; Higginbotham v. Ouachita Parish Police Jury, supra.
On the date of the accident, the plaintiff had been working for the Bossier Parish Sheriff's Office in the Tax Assessor's Department. She had obtained this job through the Council on Aging and had been at work only three weeks, since December 1, 1986. The job was to last for three months with the possibility, contingent on both the employee's performance and the employer's financial situation, that the job might last indefinitely. The plaintiff was earning $5 per hour and working 32 hours per week.
In previous years, the plaintiff had been consistently employed in Bossier City government, first as deputy clerk and later clerk of the Bossier City Court and then as secretary to the mayor of Bossier City. The plaintiff had then left Bossier City after her second marriage and was strictly a housewife. In 1984, when she and her second husband separated, she returned to Bossier City. Apparently the plaintiff had attempted to find work without success until she procured the job with the Bossier Parish Sheriff's Office.
Between the date of the accident and the date of the trial, plaintiff has had two other temporary jobs. From mid-June 1987 until August 1987, the plaintiff filled in at an advertising agency for a secretary on maternity leave. That job paid $4 per hour for a 40-hour week. She also worked temporarily with the Bossier Housing Authority for three months making $3.50 per hour for 32 hours per week.
The plaintiff had been unable to find other employment at the time of trial. She conceded that this was due in part to her age, 61, and in part to the lasting effects of her leg injury. She is unable to stand for long periods of time, run errands, use stairs, bend or kneel, and this makes her unsuitable for clerical tasks associated with most secretarial positions.
In making its award for lost wages, the trial court noted that, at age 61, the plaintiff had four years of prime employability remaining in her life. Considering the local *95 economy in conjunction with the plaintiff's age and her past difficulty in securing employment, but without the physical limitations caused by this accident, the trial court estimated that of these four years the plaintiff would have been employed for a full two years. Using the $5 per hour she was earning and 32 hours per week she was working at the time of the accident, the trial court awarded the plaintiff $16,000 in lost wages. We find the factors used in the computation to be an appropriate estimate of plaintiff's lost wages caused by the physical limitations which now make her less desirable as an employee. There was no abuse of the trial court's discretion. Accordingly, we affirm the $16,000 award.

CONCLUSION
In summary, we affirm the trial court's finding of liability on the part of the DOTD. However, the trial court erred in assessing 100 percent of the fault to the DOTD. Plaintiff's recovery is therefore reduced by the 50 percent we find her to be comparatively negligent. The remaining 50 percent liability is assessed to DOTD and L.J. Earnest, Inc., which, as we noted earlier, we do not proportionately assess because of the determination of the nature of the liability of each. Plaintiff's general damage award will be amended to reduce that award from $250,000 to $150,000. The portion of the judgment denying DOTD's third party demand is reversed, and DOTD will be granted indemnity from L.J. Earnest, Inc. for any damages DOTD pays to plaintiff.
For the reasons aforesaid, the first paragraph[6] of the trial court judgment is hereby amended to grant judgment in favor of Clarice L. Roberts and against the State of Louisiana, Through the Department of Transportation and Development, L.J. Earnest, Inc., and its insurer, First Horizon Insurance Company, in solido, in the full and true sum of Ninety-Seven Thousand, Eight Hundred Thirty-Seven and 41/100 Dollars ($97,837.41).
The second paragraph of the trial court judgment is hereby reversed, and it is ordered, adjudged, and decreed that there be judgment in favor of the third party plaintiff, the State of Louisiana Through the Department of Transportation and Development, and against the third party defendant, L.J. Earnest, Inc. and its insurer First Horizon Insurance Company, for all amounts third party plaintiff pays the original plaintiff, Clarice L. Roberts. Trial court costs are assessed against L.J. Earnest, Inc. and DOTD, in solido. The appellate costs are assessed one-half to the plaintiff and one-half to L.J. Earnest, Inc. As amended, the trial court judgment is affirmed.
AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART, AND RENDERED.
BROWN, J., concurs and assigns written reasons.
BROWN, Judge, concurring.
I agree with the results reached by the majority but believe it is necessary to explain my reasons assessing plaintiff with fifty percent fault.
The only witness who actually viewed the entire accident was Emmit Taylor. Mr. Taylor, a school bus driver, was in his personal vehicle driving immediately behind plaintiff. The posted speed for this construction area was 45 miles per hour. Mr. Taylor estimated his speed to be about 50 miles per hour and believed plaintiff was traveling at that speed or a little faster. Mr. Taylor testified that plaintiff ran off the roadway twice and on the second time immediately jerked back, crossing the center line into oncoming traffic. Plaintiff did not remember the accident and no other witness saw the cause of the accident.
The photographs taken at the accident scene before the vehicles were removed demonstrates that this was unmistakably a construction area and that a large sign warning of road construction was situated immediately before plaintiff entered the accident area.
*96 The highway where this accident occurred was sufficiently wide and distinctively marked with a white stripe on its outside edge. The "edge ruts" were off the hard surface and were the results of a soft shoulder.
Although I do not agree that a driver who strays onto a defective shoulder is necessarily at fault in a resulting accident, I do agree that under the circumstances of this case plaintiff was at fault and that the percentage apportioned by the majority is correct.

APPLICATION FOR REHEARING
Before SEXTON, LINDSAY, HIGHTOWER, BROWN and STEWART, JJ.
Rehearing denied.
NOTES
[1] Although the motion for summary judgment was granted prior to trial, by an opinion dated June 13, 1988, the judgment was not signed until March 20, 1990. Plaintiff's devolutive appeal of that judgment, taken on March 30, 1990, was therefore timely.
[2] Although Judge Shortess's opinion in Robinson is listed as a concurrence, we note that it is subscribed to by a majority (three of five) of the panel that decided the case.
[3] Implicit in that decision was a conclusion that a contractor performing construction on the road in question was negligent under LSA-C.C. Art. 2315 in regard to the condition of the manhole.
[4] DOTD may not seek indemnity for its own Art. 2315 negligence. LSA-R.S. 38:2216(E); Clement v. State, Department of Transportation and Development, 528 So.2d 176 (La.App. 1st Cir. 1988), writ denied, 532 So.2d 157 (La.1988).
[5] We do not consider the plaintiff to have been negligent in abruptly turning her steering wheel in an attempt to reenter the highway. The evidence revealed that this response, although intentional, was a spontaneous, instinctive reaction. Expert testimony revealed that the same reaction would likely have been made by a majority of drivers faced with the situation in which plaintiff found herself. The jurisprudence has also found this instinctive response does not constitute contributory negligence. LeBlanc v. State, supra.
[6] We here refer to the first paragraph of the decree portion of the judgment.