576 So.2d 470 (1991)
Donna KOSLOWSKI and Wally Koslowski
v.
Dr. Gayle M. SANCHEZ, D.D.S., Shenandoah Dental Clinic, Inc., and CNA Insurance Company.
No. 90 C 1474.
Supreme Court of Louisiana.
March 11, 1991.
*471 Ralph L. Fletcher, Steve M. Marks, Marks & Lear, Baton Rouge, for Donna Koslowski and Wally Koslowski plaintiffs-applicants.
William Carruth, S. Alfred Adams, Carruth, Cooper & Adams, Baton Rouge, for Douglas D. Green, Comm. Ins. for the State of La. and the La. Patient's Com. Fund defendants-respondents.
Stephen R. Wilson, Keogh, Cox & Wilson, Baton Rouge, for Gayle M. Sanchez, D.D. Shenandoah Dental Clinic and CNA Ins. defendants-respondents.
WATSON, Justice.
The initial question is whether the dental health care provider's insurer made a $100,000 settlement with plaintiff. When there is a $100,000 settlement with the health care provider's insurer, the patient's compensation fund can only litigate quantum. LSA-R.S. 40:1299.44(C)(5). The primary issue is whether that rule of law applies to a settlement after trial.

FACTS
In this suit for dental malpractice, plaintiffs, Donna and Wally Koslowski, demand damages for nerve damage and facial dysesthesia, allegedly resulting from substandard performance of a root canal on Donna by Dr. Gayle M. Sanchez, a member of the Shenandoah Dental Clinic, Inc.
On September 6, 1984, Dr. Sanchez performed a root canal, an endodontic procedure, on Donna's second molar in her left lower jaw. The initial x-ray indicated the tooth had one large straight root. The finishing x-ray showed an overfill of the tooth into the mandibular canal, which indicated possible complications. Donna had numbness and pain after the procedure but returned to work with prescriptions for a painkiller and an antibiotic.
The mandibular canal is a tunnel in the jawbone where the nerves and blood vessels that supply the lower jaw are located. Since the end of Donna's tooth was very large, the filling material went into that canal.
In the conventional method of doing a root canal, the tooth cavity is filled with gutta-percha, a hard substance, which must be warmed and softened. The alternate Sargenti technique employed by Dr. Sanchez uses N-2 paste, which contains a powerful disinfectant, paraformaldehyde. The N-2 paste is semiliquid, which makes it easier and faster to handle than gutta-percha. *472 The jury may have inferred that the fluid N-2 paste is also more likely to overfill than solid gutta-percha.
An April, 1984, report in the Journal of the American Dental Association documented serious inferior alveolar nerve dysesthesia or numbness after endodontic procedures in three cases. LaBanc and Epker, Serious Inferior Alveolar Nerve Dysesthesia After Endodontic Procedure: Report of Three Cases, 108 J.A.D.A. 605 (1984). According to the article, when a tooth's root ends close to the nerve, the Sargenti technique should be avoided to prevent nerve damage. After an overfill, where the root canal filling material extrudes into the mandibular canal causing pain or dysesthesia, the patient should be immediately referred to an oral surgeon experienced in microsurgery, who can remove the filling material and possibly restore sensation.
Because the apex of Donna's molar ended in the mandibular canal, there was a known risk from the Sargenti method root canal. Although unaware of the Journal article, Dr. Sanchez admitted in deposition that he knew of the danger, describing the root's intrusion into the inferior alveolar canal as a "loaded gun," "a bad situation," "trouble."
Donna thought her pain and numbness after the procedure were normal. On the following day her face was still numb and she had a problem eating. On Sunday, September 9, 1984, when she was still complaining, her husband told her that novocaine does not last for three days and she should return to the doctor.
Donna made an unsuccessful attempt to see Dr. Sanchez on September 11, 1984. Although he was not available, he called in a prescription for her. When Donna saw Dr. Sanchez on September 14, 1984, she complained of persistent pain and numbness. Dr. Sanchez extracted the tooth. After another x-ray, Dr. Sanchez and an associate attempted, unsuccessfully, to suction the hardened N-2 paste out of the cavity.
Donna Koslowski testified that the numb sensation, which persisted on the left side of her face after removal of her tooth, is similar to having a permanent injection of novocaine. She has pain which comes and goes with changes in the weather and often bites the inside of her cheek. She now lives in New York City and is very sensitive to the winter cold. Donna is self-conscious about her appearance, because her mouth feels crooked. She gets a pressure-type pain if she talks or eats for a long period of time. Her mouth drools, and she has problems eating, drinking and kissing. Her speech is sometimes slurred. She constantly checks her mouth to make sure that saliva is not running out of the numb side of her face and uses the right side for eating and drinking.
In Baton Rouge, Donna was a manager of the linen department at Dillard's Department Store in Cortana Mall. In New York, she is now a customer service representative for The Bank of New York. Donna's New York job is primarily on the telephone and she no longer feels capable of the constant personal contact she had at Dillard's.
Donna and Wally were married, both for the first time, in January of 1982 and were divorced in July of 1987. Donna was bitter about her facial problem and said that she took her anger out on her husband. They separated in December of 1985. According to Wally, Donna is a trusting person, and kept assuming that the condition of her mouth would improve. He finally recommended that she go to another dentist.
Donna went to Dr. Chisholm, who told her that the numbness was permanent. She was very distressed and went to see Dr. Rosenberg, who gave an identical opinion. Donna was then convinced that her condition was permanent. She was twentynine at the time of the root canal and Dr. Sanchez described her as an attractive lady.
Dr. William C. Chisholm, Jr., an endodontist, examined Donna in September of 1985. A radiograph showed a radiopaque mass in the area of her mandibular nerve. In Dr. Chisholm's opinion, surgical removal of the mass had an unjustifiable risk of harm. Donna's complaints were consistent with his examination and diagnosis. He testified that Donna could have sensations from cold or heat because the nerve was probably damaged but not totally destroyed. Dr. Chisholm was unable to determine the exact extent of Donna's sensory loss but said it is a permanent condition.
Being told that the condition was permanent reduced Donna to tears. According to Wally, she envisioned herself as an old hag with a drooping face and drooling mouth. After the root canal, Donna stopped using lipstick and became somewhat withdrawn. After she saw Dr. Chisholm, her entire personality changed and she became extremely withdrawn.
*473 Dr. Paul Rosenberg, an endodontist, saw Donna on January 9, 1986. She complained about paresthesia or numbness of the lower left lip and associated area. Donna was emotionally upset and hoping for a resolution of her problem. However, the condition was found to be permanent and irreversible. In Dr. Rosenberg's opinion, Donna's complaints were consistent with his findings. Patients with paresthesia frequently describe sensitivity to coldness or heat. Some of the neurofibers remain and fire off irregularly, giving odd sensations.
A twelve-person jury unanimously concluded that Dr. Sanchez committed malpractice which resulted in plaintiff's injuries. The jury did not award Wally Koslowski damages for loss of consortium but awarded $250,000 to Donna Koslowski. One juror disagreed with the award. The jury verdict was rendered on November 11, 1988.
Shortly after trial, on January 20, 1989, Donna Koslowski executed a release of Dr. Sanchez, the Shenandoah Dental Clinic, Inc., Continental Casualty Company, and the CNA Group of Insurance Companies for the consideration "of $100,000, or equivalent, receipt and sufficiency of which is hereby acknowledged," reserving her rights against the patient's compensation fund of the state of Louisiana.
The fund appealed, contesting both liability and damages. Plaintiff protested that the fund could not contest liability under LSA-R.S. 40:1299.44(C)(5) which provides, in pertinent part: "In ... determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars, ..."
Koslowski v. Sanchez, 563 So.2d 937 (La. App. 1st Cir.1990), held that the fund could contest liability because the settlement was after trial. On the merits, the court of appeal decided that the jury's verdict was manifestly erroneous, because Dr. Sanchez did not fall below the standard of dental care in Baton Rouge, Louisiana. On this issue, which we do not reach, see Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978) and LSA-R.S. 9:2794. The trial judge had instructed the jury that Dr. Sanchez had to conform to the standard of care in Baton Rouge or a similar locality. A writ was granted to consider the judgment of the court of appeal. 567 So.2d 1111 (La.1990).

ISSUES
The issues are: (1) whether there was a settlement for $100,000 on behalf of the health care provider; and (2) if so, whether the $100,000 settlement after trial prevented the fund from contesting liability in its appeal.

CONCLUSION

I
Although the court of appeal opinion was written upon a representation that $100,000 had been paid to Donna Koslowski and she acknowledged receipt of that sum, the insurer apparently paid only $93,500. Counsel for the insurer settled for the lesser amount by arguing that the cost of the jury and the medical review panel should be deducted from plaintiff's recovery. Counsel for plaintiff represents that he had little choice, because interest does not run on the $100,000 sum. Although Donna Koslowski only received $93,500, she signed a receipt for $100,000 and released Dr. Sanchez, the qualified health care provider, and his insurer. Allowing a small discount for prompt payment does not alter the fact that the insurer of the health care provider settled the claim against its insured as required by the statute.
Stuka v. Fleming, 561 So.2d 1371 (La. 1990), held that settlement for $100,000 with one health care provider or its insurer forecloses the issue of liability as to the patient's compensation fund: "[U]nder the express terms of Section 1299.44C, the malpractice victim's settlement with one health care provider or his insurer for $100,000 not only triggers the Fund's liability for excess damages, if any, but also precludes the Fund from contesting that health care provider's liability." 561 So.2d at 1373-74.
Here, although plaintiff did not receive the full amount she was due, there was a facial settlement for $100,000, the insurer's policy limits. The settlement met the statutory requirements for access to the fund. See Eakin v. Mitchell-Leech, 557 N.E.2d 1057 (Ind.App. 3d Dist.1990).

II
The Louisiana Medical Malpractice Act contemplates only one party defendant, the health care provider. Williams v. Kushner, 449 So.2d 455 (La.1984). "The fund is not a negligent party and does not have the status of an Article 2315 defendant." Williams v. Kushner, 549 So.2d *474 294, 296 (La.1989). While the patient's compensation fund is not a party defendant, it is a third party with an interest in the proceedings when damages exceed $100,000. Therefore, the fund has the right to intervene in the case of an excess judgment against the fund. Felix v. St. Paul Fire and Marine Ins. Co., 477 So.2d 676 (La.1985).
Liability under the Medical Malpractice Act is based on the initial $100,000 paid by the health care provider or its insurer, pursuant to judgment, settlement or arbitration. When the insurer has admitted liability up to the statutory maximum, the liability of the health care provider is established, and the only remaining issue is the damages, if any, owed by the patient's compensation fund. The fund cannot contest liability when there is a binding settlement for $100,000 by the health care provider, either before or after trial.
The court of appeal erred in holding that the fund could contest liability following a post trial settlement by the insurer of the health care provider for $100,000.

QUANTUM
Donna Koslowski, an attractive young woman, has a permanent loss of sensation in her face. For a similar injury, see Kopecky v. Hasek Bros., 180 Iowa 45, 162 N.W. 828 (1917), where an overfill of a tooth presented a jury question on negligence in 1917. Although not disabling or even apparent to the casual observer, Donna's condition must be frustrating, a daily irritant. The jury apparently believed Donna's testimony that her life has been seriously and adversely affected by the permanent injury to the nerve in her jaw. An injection of novocaine is a common experience and the numbness it causes was undoubtedly familiar to the jury. The jury heard Donna's testimony, evaluated her plight and awarded damages of $250,000.
The jury made no award for Wally's loss of consortium. The jury correctly considered the two claims separately and gave no weight to Wally's testimony that the consequences of the root canal had affected the couple's sex life.
It is difficult to review awards of general damages. Much discretion is accorded the trier of fact, who has the opportunity to weigh the credibility of the witnesses. "In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." LSA-C.C. art. 2324.1. Because Donna's complaints are so peculiarly subjective, there is no point in remanding to the court of appeal for a de novo review. In truth, there is little here to be reviewed. Two experts said that Donna's complaints were consistent with her injury and the jury apparently accepted those complaints at face value. Since liability was established and there was no abuse of discretion in the jury's award, the award is affirmed.

DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed and the judgment of the trial court is reinstated. The Louisiana patient's compensation fund is cast for all costs.
REVERSED AND RENDERED
HALL, J., concurs with reasons.
LEMMON, J., concurs and assigns reasons.
HALL, Justice, concurring.
LSA-R.S. 40:1299.44(C)(5) provides that the liability of the health care provider shall be considered as admitted and established where the insurer has paid its policy limits of $100,000. Accepting as fact that the insurer paid plaintiff the equivalent of $100,000 as stated in the release instrument (apparently $93,500 cash and credit for costs of the medical review panel and jury paid by the insurer), I agree that it matters not whether the payment was made before or after trial and judgment in the district court. Upon payment of the policy limits by the insurer, the fund as intervenor can only contest the amount due, not liability.
LEMMON, Justice, concurring.
The health care provider's insurer paid $100,000 to the tort victim after the judgment of the trial court had been rendered and the insurer's application for a new trial had been denied.[1] Once $100,000 is paid by or on behalf of a health care provider at *475 any time, the health care provider's liability (which is an issue solely between the tortfeasor and the tort victim) is no longer an issue. The Legislature, in an apparent balancing of the competing interests between medical malpractice victims and health care providers, decided as a policy matter that a payment of $100,000 is significant enough to foreclose further litigation of liability. The only issue remaining thereafter between the tort victim and the Patients Compensation Fund is the amount of damages.
On the damages issue, I would prefer, in order to be consistent as to review of damages after reversing an intermediate court on liability, to remand this case to the court of appeal to review damages, an issue which that court never reached in its earlier decision.
NOTES
[1] The release shows payment of $100,000 "or equivalent". Since the settlement occurred after trial, there has been no evidence introduced as to any variance between the amount stated in the release and the amount paid. Apparently, the insurer has paid $93,500 directly to the victim and received credit for $6,500 paid for jury and medical review panel costs. Because there was a judgment of $100,000 and an apparent payment of that amount or equivalent, the statutory admission of liability has been triggered.