| iNORRIS, Judge.
Candice and Richard Lewis appeal a judgment absolving the State of Louisiana, through the Department of Transportation and Development (“DOTD”) of liability in an accident in which their car collided with a tree falling across a state highway. For the reasons expressed, the trial court was plainly wrong to find that DOTD neither knew nor should have known of the dead and hazardous condition of the tree. We therefore reverse and render.

Factual background

The accident occurred on January 13,1992 as the Lewises were returning to West Monroe from a family trip in Arkansas. Richard was driving their 1982 Chevy Caprice south on La. Hwy. 15 in Union Parish between Farmerville and the Ouachita Parish line. Candice was sitting in the front passenger seat with their infant daughter; their other two children were in the back seat. Suddenly Richard noticed a movement to his right; when he glanced that way, he saw a large tree falling down toward the highway. He immediately shouted for Candice to lie down, and he hit his brakes. Despite this precaution, the car collided with the tree just as it landed on the road; both car and tree were thrown into a pond of water off the west shoulder. The tree had fallen from the west side, spanning not only the paved road but also beyond the east shoulder. Candice was seriously injured by the impact, sustaining a large gash wound to the middle of her face. Richard and the children sustained minor injuries.
The tree in question, a large sweet gum, was actually situated on private property belonging to the Ouachita Valley Council of the Boy Scouts of America some 44.6' from the centerline of the highway and 14.6' from the edge of DOTD’s right-of-way. The Lewises originally sued both DOTD and the Ouachita Valley Council, but they settled with the latter in April 1993, reserving their claims against DOTD. The trial evidence therefore centered on the alleged negligence of DOTD in failing to detect hand remove an obviously dead tree which, even though located on ad *263 joining, private property, posed a risk to the motoring public.
Dr. F.F. Jewell Sr., professor of forestry at Louisiana Tech University and accepted as an expert in forest pathology, examined the site about one month after the accident. He testified for the plaintiffs that the sweet gum was dead when it fell, and was “well involved in wood rot” as almost all the debris he found on the ground had some rot. He conservatively estimated that the tree had been dead for two years, and probably for five. He testified that the first sign of trouble in a tree appears in the crown, so he tells his students to look up to determine if a tree is dead or dying. A sweet gum’s bark remains firmly attached to the trunk even after death, and so a person looking at only the bottom 40' of the tree would not see that it was dead, but Dr. Jewell testified that “most folks” would look at the whole tree. Moreover, Dr. Jewell found that this tree had apparently lost most of its small branches, a clear indication that it was dead. He admitted that in January, when the accident occurred, deciduous trees were bare, whether live or dead, but for eight months of the year they have greenery. The subject tree, the sweet giim, would have presented itself as an obvious “dead stob” (a stem with only large branches still attached) for several summers before it fell. Dr. Jewell paced off the stem of the tree, which was still on the site, and estimated its length at 60'. He also testified that a stump of some 18-24" high was still in the ground, and a large amount of top debris, perhaps 20', was still present on the east side of the highway right-of-way. Dr. Jewell also testified that if the tree had not been dead, it would not have fallen when it did.
At the time of the accident there were two smaller trees standing within a few feet of the sweet gum. Shortly before trial, both of these trees were down, having fallen or been cut.[1] However, based on their trunk size, Dr. Jewell estimated they |3were about one-third to one-half the size of the sweet gum. He could not be certain, but conceded they may have been 40' tall. During spring and summer these trees were green while the sweet gum was a “dead stob.” Although he did not measure these trees, he expressed the opinion that the sweet gum was tall enough that “it certainly should’ve been visible” over them. Even on cross examination, when DOTD’s counsel advanced the theory that the surrounding trees probably obscured the view of the sweet gum’s dead stob, Dr. Jewell was insistent that this tree was “sticking well above the canopy” of the other trees and that a person driving south on Hwy. 15 “would have seen it quite well.” R.pp. 147, 148.
The Lewises’ other expert, Mr. Barry M. Preaus, was accepted as an expert in forestry. He testified that in order to determine whether a tree is dead, one must look up in its canopy to see whether it has toned colors or lost its foliage and small limbs. A sweet gum, in particular, shows its death by the loss of leaves and small branches. Mr. Preaus further testified that the lack of foliage is “readily observable” in spring and summer. Like Dr. Jewell, he felt this sweet gum had been dead for at least two years. He testified that had he driven by the site in the spring or summer of 1991, he would have noticed this bare tree sticking above the smaller green trees and realized that it was dead. He added that a live tree probably would not have fallen.
On cross examination he admitted that this sweet gum had apparently stood straight up, and was not leaning. He also answered DOTD’s questions as to whether the surrounding trees would have obscured the view of the sweet gum. The two smaller trees had trunk diameters of about 10", considerably less than the sweet gum’s 24" trunk, and would not have produced as much of a canopy as the sweet gum. He estimated that one of the smaller trees may have been 40' tall. He admitted that after the sweet gum died, over time the smaller trees’ canopy would have expanded and could have obscured, to some degree, the craggy top of the dead sweet gum. He agreed it was probable that the smaller trees obscured “some portions” of it. On | ¿redirect, however, he reiterated that had he been cruising Hwy. 15, he could *264 have looked up and seen that the sweet gum, which was considerably taller than the surrounding trees, was dead.
Mr. Preaus also testified that the area where the sweet gum stood was a problem location because standing water was so often present there. Standing water creates concern on the part of foresters, and Mr. Preaus had noticed other dead trees in the area. R.p. 231. Another witness, Trooper Odom, who investigated the accident, corroborated that the area was under water part of the year, and he had noticed three or so dead trees (but not this particular sweet gum) in the vicinity. R.pp. 174-175.
The Lewises also called Russell Barnes, the camp ranger at Camp T.L. James, the boy scout property on which the sweet gum was located. On cross examination he admitted he had been on the job only since August 1991 (about five months before the accident) and testified' that he had not yet inspected the entire property. He also testified that he does not specifically inspect for dead trees. He testified that he had never noticed the dead sweet gum, but “it’s possible” the two smaller trees nearby would have obscured his view of the bare top of the dead tree.
The other witness pertinent to DOTD’s liability was John Watley, the Parish Highway Maintenance Superintendent for some seven years at the time of trial. He testified that his job is to oversee the State highways in Union Parish, to check the paved portion to the right-of-way, and even to look for dead trees in the vicinity of the road. R.p. 193. Even a tree on private property, if it is tall enough to fall on the road, should come within his notice; if the tree appeared to be dead or dying, he would contact the landowner about removing it. Despite this admitted duty to inspect, however, Mr. Watley testified that he had received no instruction in how to check a tree to see if it is dead; he testified he would be on notice if the tree was dead and leaning. R.p. 211. He further explained that he does not make his inspection on foot; this would be impossible given the amount of state highway in the parish. Rather, he | gdrives every state highway in the parish once every two weeks, and sometimes more often, to perform his inspection. He described his procedure as starting with looking at the center line, “spanning out” and “scanning ahead.” R.pp. 199-200. He usually travels 40 to 50 miles per hour. He testified he had contacted landowners about trees four or five feet off the right-of-way, but never about a tree 14' off. He said he never saw this sweet gum; it was “one I just missed.” R.p. 206. He reiterated he probably would have noticed it if it was dead and leaning toward the road. He added that he never looked higher than 30 or 40', or else he would probably run off the road. He was not certain how tall any of the trees were, or how far the right-of-way extended. He also testified that the small trees nearby probably would have obscured his view of the sweet gum, if he had looked up that high. R.p. 208.

Action of the trial court

By written opinion the trial court restated the facts of the accident, as well as the expert testimony that the sweet gum had been dead for at least two years, but found no evidence that this tree was leaning or that its first 50' of bark appeared abnormal. The court also noted the evidence that Mr. Wat-ley patrolled each highway at least every two weeks and never noticed this tree. The court then stated that the experts “agreed that the only way to tell if this tree had been dead before it fell was to have stood underneath it and looked up into the canopy.” R.p. 68. Further, “there was some evidence that two nearby trees might have obscured the view of the fallen tree’s canopy before it fell. There was no foliage on this tree but this was not unusual considering that the accident occurred in a winter month.” R.pp. 68-69. Citing the standard of actual or constructive knowledge of hazardous conditions on the highway, Walker v. Department of Transp. & Dev., 460 So.2d 1132 (La.App. 2d Cir.1984), writ denied 464 So.2d 1377 (La.1985), the court held that the state reasonably patrolled the highway searching for such conditions before they became hazardous. Specifically, the court found the state is not required to physically walk private lands containing Istrees that might fall onto the highway. Further, this tree “did not appear dead from the visual inspection of the High *265 way Maintenance Superintendent whose duty it is to inspect for hazardous conditions.” The court therefore dismissed the Lewises’ claims, and this appeal followed.

Applicable law

Under Louisiana law, DOTD is not a guarantor of the safety of travelers, but it owes a duty to keep the highways and their shoulders reasonably safe for motorists. Walker v. Department of Transp. & Dev., 460 So.2d at 1135. Liability based upon negligence attaches when DOTD has actual or constructive knowledge of a hazardous condition upon' its highways and fails to take corrective action within a reasonable time. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980). The DOTD has the right to remove a tree located on private property adjacent to its right-of-way when the tree poses imminent danger to the users of the highway. Adams v. State, Dept. of Highways, 357 So.2d 1239 (La.App. 2d Cir.1978). The DOTD has a duty to remove a tree from property adjacent to its right-of-way when it has actual or constructive knowledge that the tree is in such a condition that it may fall upon the road and create imminent danger for users of the road. Walker v. Department, supra; Wilson v. State, through Dept. of Highways, 364 So.2d 1313 (La.App. 3d Cir.1978). See also Annotation, “Liability of governmental unit for injuries or damage resulting from tree or limb falling onto highway from abutting land,” 95 A.L.R.3d 778 (1977), § 6. The DOTD is not required to make a minute examination of every tree on property adjacent to its right-of-way; the duty is to observe and remove trees that are dead or leaning or otherwise appear defective by general observation. Walker v. Department, supra.
Appeal lies from the judgment itself, not the reasons for judgment. Hardin v. Munchies Food Store, 510 So.2d 33 (La.App. 2d Cir.1987). Nevertheless, a trial court’s factual findings may not be disturbed unless, after a review of the entire record, those findings are determined to be plainly wrong or manifestly erroneous. Stobart v. State, through Dept. of Transp. & Dev., 617 So.2d 880, 882 (La.1993). This is not to say, however, that a trial court’s factual determinations cannot ever, or hardly ever, be upset. Ambrose v. New Orleans Police Dept. Ambulance Serv., 639 So.2d 216 (La.1994). While the appellate court may not simply substitute its findings for those of the trial court, the appellate court is empowered to determine whether a trial court verdict was clearly wrong based on the evidence, or clearly without evidentia-ry support. Id.; La. Const, art. 5 § 10(B). Once an appellate court determines that the trial court was clearly wrong, the appellate court is authorized to render any judgment which is just, legal and proper. La.C.C.P. art. 2164; Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 973 (La.1985); Beckham v. St. Paul Fire & Marine Ins. Co., 614 So.2d 760, 769 (La.App. 2d Cir.1993).
The liability of the owner of a tree, though not at issue in this case, is strict. La.C.C. art. 2317; Loescher v. Parr, 324 So.2d 441 (La.1975). Liability for damages caused by two or more persons who did not conspire to commit an intentional or willful act is solidary to the extent necessary for the injured party to recover 50% of his recoverable damages. La.C.C. 2324. Even though a defendant’s liability may be strict and therefore nonnegligent, the degree of its causal effect on the plaintiffs injuries may be compared with another party’s negligence. Howard v. Allstate Ins. Co., 520 So.2d 715, 719 (La.1988).[2] In assessing the relative fault of the parties, courts look to various factors, including whether the conduct resulted from inadvertence or involved an awareness of the danger, how great a risk was created by the conduct, the significance of *266 what was sought by the conduct, the capacities of the | sactor, whether superior or inferi- or, and any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm, 469 So.2d at 974 (La.1985).

Discussion: Liability

By their first five specifications of error, the Lewises urge the trial court committed manifest error in various aspects of its findings. They particularly contest the court’s conclusions that “the experts agreed that the only way to tell if this tree had been dead” was to stand beneath it and look straight up, and that two nearby trees might have obscured the view of the sweet gum’s canopy before it fell. Based on these factual errors, the Lewises contend the court committed legal error in concluding that DOTD lacked actual or constructive knowledge of the hazardous condition and satisfied its duty of reasonable care in making the highway safe. These arguments have merit.
Two experts described how they would examine a tree to see if it was dead. Mr. Preaus testified that he looks up at the canopy to check for loss of foliage, small limbs and perhaps larger limbs. R.pp. 224-225. He explained that “a lot of times I may walk up to a tree and never see the top * * * and not know the tree is dead until I back up and look to measure the height.” R.p. 225. The loss of foliage, he added, is readily observable. Id. Dr. Jewell testified that he always told his students to “look up” to see whether a tree was dead. R.p. 155. He also said that most observers look at the whole tree. R.p. 143. The process of deterioration is when “small branches and twigs come off first in the small branches, then parts of the larger branches and then the larger branches,” R.p. 130, and these are obviously the items that students should look for.
The record is devoid of expert evidence that the only way to see that a tree is dead is to stand directly beneath it and look straight up. In fact, Mr. Preaus testified that this would frequently not reveal the evidence of a dead tree. Both experts stressed the necessity of viewing the canopy of the tree, which is obviously not accomplished by 1 gonly a bottom-up view. The lay testimony also fails to support the trial court’s finding. Mr. Barnes, the camp ranger who had been on the job just a few months when this accident occurred, testified that he did not look for dead trees; and Mr. Watley, DOTD’s parish maintenance superintendent, indicated that he would spot a dead tree only if it was dead and leaning, R.p. 211. However, neither expert said the tree had to be leaning before it could be pronounced dead. The record simply does not support the trial court’s finding that a burdensome on-foot inspection of trees is necessary.
The court’s finding as to obscurement is also troublesome. The experts did not measure the remaining trees before they were removed, so the opinions are somewhat speculative. However, the loss of the evidence should not destroy the plaintiffs’ case; the experts projected solid estimates of the trees’ heights based on the diameters of the trunks (the sweet gum’s stem, stump and debris provided an excellent estimate of its height, as well). Even under cross examination, they were steadfast in their opinion that the smaller trees’ tops would, at best, have only 'partly obscured the view of the sweet gum’s dead stob. Mr. Watley, in response to leading questions, stated that the small trees probably would have obscured the top of the sweet gum. However, Mr. Watley admitted he did not look at the sweet gum’s crown, as both experts said was necessary. In light of the expert evidence that the dead sweet gum was readily apparent as it towered over the two smaller trees, and Watley’s admission that he simply did not look where he needed to look, the trial court’s finding of obscurement is simply unsupported by the record.
Mr. Watley explained that his duties as maintenance inspector included looking for trees that might fall on the road and endanger motorists. This accurately reflects the state’s duty of reasonable care to maintain the highways in a safe condition. Sinitiere v. Lavergne, supra; Walker v. Department, supra. The experts agreed that the dead stob of this sweet gum would have been readily apparent to anyone driving north or *267 south on Hwy. 15 in the two springs and summers that preceded the accident; in | ipfact, the photos taken at the scene, especially Exhibits P-23 and P-24, show that dead trees can be easily discerned by anyone scanning ahead on this straight stretch of road. The DOTD inspectors are not required to perform burdensome, on-foot examinations of trees off the right-of-way to pronounce them dead. However, the instant sweet gum stood well over 60' high, and was only 44.6' from the center of the highway; it was obviously tall enough to block the road if it fell that way. In the exercise of reasonable care the DOTD’s inspector, who traveled the road over 30 times when the surrounding trees were in foliage, should be able by general observation to see what the experts agreed was obvious, and recognize the danger posed when more than 20' of the top of a bare tree is visible, even if its bark is intact and its stem straight. Because the condition of this dead tree was obvious, the trial court erred in finding the state did not have constructive knowledge of the imminent danger it posed.
Moreover, the trial court was plainly wrong not to find that the DOTD was negligent in inadequately training Mr. Watley in the skills necessary to discharge his duty. Although he testified he was required to look on adjacent, private property for dead trees that might fall on the road, he admitted he had no training whatsoever as to how to tell if a tree was dead. He did not recognize the risk of trees growing in standing water. His knowledge seems to be confined to spotting branches that overhang the highway and tree stems that are leaning precariously over it. His testimony belies a degree of training on the state’s part inadequate to discharge its acknowledged duty of care.
The judgment absolving the DOTD of liability will be reversed.

Allocation

As noted earlier, the Lewises settled with the Ouachita Valley Council of Boy Scouts, the defendant who owned the tree and whose liability was strict under La.C.C. art. 2317. DOTD’s negligence makes it liable for “damages caused by two or more persons” under La.C.C. art. 2324B. The record will not support a conclusion that | nthe Lewises were at fault. We will therefore compare the causal effect of each defendant’s conduct in producing the Lewises’ damages, under the principles of Watson v. State Farm, supra. In argument to the trial court, the Lewises urged DOTD should be assessed with 80% of the fault.
The first and perhaps most important consideration is the strong codal emphasis on liability for any person having care, custody or control of a thing. La.C.C. art. 2317; Loescher v. Parr, supra. The primary responsibility for detecting and removing dead trees should be with the owner. The Ouachita Valley Council had a professional forester, Mr. Barnes; he testified, however, that at the time of this accident the Council did not have a program of forest maintenance and he did not scout for dead trees. Furthermore, an owner with a forester is better able to perform a physical inspection, as contrasted with a highway superintendent, whose duties also include cheeking for defects and obstructions on the road surface and shoulders, potential drainage problems, signing, and anything else that might affect traffic. We cannot dispute Mr. Watley’s testimony that if he spent too much time looking up into the trees, he would likely run off the road; this suggests that his inspection is necessarily conducted in some haste. We also recognize that the farther a tree is located off the right-of-way, the more difficult it is for an inspector driving a truck on the highway to discern when it is dead and might fall onto the road. Against this, however, we must weigh the significance of the DOTD’s duty to keep the highways free of conditions that pose imminent danger. Wilson v. State, 364 So.2d at 1316. On the record presented, we find that DOTD should be apportioned 35% of the fault.
Because the Lewises settled with the Ouachita Valley Council, their recovery against DOTD is limited to 35% of their recoverable losses. La.C.C. art. 1803; Canter v. Koehring Co., 283 So.2d 716 (La.1973).
*268 | ^Quantum,
By their sixth assignment of error, the Lewises urge the trial court erred in failing to award them damages. The trial evidence showed that they incurred various medical expenses as a result of the accident, the loss of their car, lost work time for Mr. Lewis, and projected future medicals for Mrs. Lewis. In addition they request general damages.
When the tree struck the ear, Mrs. Lewis felt a harsh impact and immediately noticed water coming into the car. Not realizing she was injured, she first searched for her baby girl, whom Mr. Lewis ultimately found under the front seat. Mrs. Lewis then helped the other children climb out of the ditch, and noticed she was having trouble breathing. Only then did she realize that her face was gashed and she was bleeding freely. She stemmed the bleeding by holding a towel to her face, and a motorist drove her to Glenwood Medical Center. There she underwent four hours of surgery to remove glass fragments, debride and repair the deep wound. R.p. 82. Dr. Lawrence Danna advised her she had lost a significant amount of tissue in the middle of her face and nose. She remained in the hospital for 10 days, during which recovery was painful. Dr. Dan-na described her injury as severe mid-facial lacerations with an avulsion of the right cheek and nose and the entire septum.
Since the accident Mrs. Lewis has suffered constant tingling and numbness about the face; Dr. Danna attributed this to nerve damage, which will be permanent. She also described “lightning pain” flashes which have diminished in frequency but still occur about once a week. R.p. 256. Dr. Danna said these also would be permanent. She is unable to lift her right upper lip, which gives her an embarrassing drooping look when she smiles. Her face is still sensitive to touch and to cold weather. Dr. Danna admitted that his first surgery had been remarkably .successful in rebuilding Mrs. Lewis’s face, but he recommended two further surgeries to complete the reconstruction of her nose. R.p. 88. She has also received treatment from Dr, | ^Coleman for general body pain, as well as medication to alleviate nightmares.
Mrs. Lewis also testified that her facial disfigurement has been embarrassing and humiliating. Her friend, Shirley Cook, verified that Mrs. Lewis has often been reduced to tears after going out in public. R.p. 291.
Mrs. Lewis urges that her injuries are similar to those described in Koslowski v. Sanchez, 576 So.2d 470 (La.1991). There a root canal patient suffered permanent loss of sensation in her face, extreme sensitivity to cold, recurrent pains in the face, and a drooping look when she smiles. Her mouth drooled and her speech was sometimes slurred. Her treating endodontist recommended against surgical repair because it posed an unjustified risk of harm. The Supreme Court awarded $250,000 in general damages. We find, however, that Mrs. Lewis’s injuries are more apposite to those sustained in Dubois v. State Farm Ins. Co., 571 So.2d 201 (La.App. 3d Cir.1990), writ denied 575 So.2d 367 (La.1991), in which a young woman in an auto accident sustained a severely broken nose, sprains, bruises and soft-tissue injuries. Her broken nose required surgery which was remarkably successful, but not completely so; further surgery was required to repair the deviated septum and, hopefully, to end her persistent headaches. The jury awarded her a total of $100,000, which the court of appeal affirmed. In Berthold v. State Farm Ins. Cos., 545 So.2d 688 (La.App. 5th Cir.), writ denied 551 So.2d 636 (La.1989), the plaintiff suffered not only facial injuries but broken ribs and lingering back pain. The court affirmed general damages of $150,000. See also Deville v. Budd Const. Co., 617 So.2d 570 (La.App. 3d Cir.), writ denied 625 So.2d 180 (La.1993), in which $100,000 was awarded. Under the circumstances, we will award Mrs. Lewis $150,000 in general damages.
The other occupants of the car were fortunately not seriously injured. Mr. Lewis suffered minor cuts and bruises, a soft-tissue injury to his lower back, and underwent an MRI which showed there was no ruptured disc; however, a preexisting condition of spondylolysis which was not symptomatic prior to the accident began to |Mcause him pain afterwards. He testified that he suf *269 fered depression, and as a result separated from Mrs. Lewis for a while. R.p. 305. Under the circumstances, an award of $15,000 for Mr. Lewis’s pain, suffering, and loss of consortium is warranted.
The Lewises’ eight-month old daughter, Amber, received cuts in her forehead from glass fragments; these were removed in the emergency room. The other children, Brandon and Jessie, received no physical injuries other than bumps and bruises, although both saw their mother seriously injured. Both were separated from her during her hospital stay. Mrs. Lewis added that Brandon, three years old, had a fear of riding in cars for a few months after the accident. Under the circumstances, general damages of $2,500 for Amber and $1,000 each for Brandon and Richard are warranted. See Vidrine v. GEICO, 528 So.2d 765 (La.App. 3d Cir.), writ denied 532 So.2d 156 (La.1988).
Special damages proved by the evidence are as follows:
Mrs. Lewis’s past medicals $27,140.26
Mrs. Lewis’s future dental work 805.00
Mrs. Lewis’s future reconstructive surgery 16,000.00
Mr. Lewis’s lost wages 2,090.00
Mr. Lewis’s past medicals 1,784.50
Loss of 10-year old Chevy Caprice 1,500.00
Amber’s medicals 210.30
Brandon’s medicals 133.32
Judgment will be rendered accordingly for 35% of these and the general damages outlined above.

Decree

For the reasons expressed, the judgment of the trial court is reversed and judgment is rendered as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of CANDICE LEWIS and against the defendant, THE STATE OF LOUISIANA, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, for 35% of the sum of One hundred ninety-three thousand, nine hundred forty-five dollars and .26/1.00 ($193,945.26) dollars, together with legal interest from date of judicial demand until paid.
liiilT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of RICHARD J. LEWIS and against the defendant, THE STATE OF LOUISIANA, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, for 35% of the sum of Twenty thousand, three hundred seventy-four & .50 ($20,374.50) dollars, together with legal interest from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of RICHARD J. LEWIS, as administrator of the estate of his minor children Richard, Brandon and Amber Lewis, and against the defendant, THE STATE OF LOUISIANA, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, for 35% of the sum of Four thousand, three hundred forty-three and .62/1.00 ($4,343.62) dollars, together with legal interest from date of judicial demand until paid.
The expert witness fee of $500.00 for Dr. Lawrence Danna and appellate costs of $113.50 are assessed to the State of Louisiana, Department of Transportation and Development, as are all trial court costs, to the extent permitted by LaR.S. 13:4521.
REVERSED AND RENDERED.

. Apparently the two trees were still standing when Dr. Jewell first visited the site in February 1992, but he was unable to get on the property and measure them.

. In Howard and in Bell v. Jet Wheel Blast, 462 So.2d 166 (La. 1985), the Supreme Court specifically held that a plaintiff’s negligence may be compared with a defendant's strict liability in the context of La.C.C. art. 2323. The rationale of Howard would appear to apply to allocating fault between defendants under art. 2324 as well. This court and another court of appeal have implicitly apportioned “fault” between strictly liable and negligent defendants. See Roberts v. State through Dept. of Transp., 576 So.2d 85, 92 (La.App. 2d Cir.), writ denied 581 So.2d 685 (La.1991); Miller v. Great Atlantic & Pacific Tea Co., 510 So.2d 695 (La.App. 1st Cir.), writ denied 513 So.2d 1213 (La.1987).