UGOTHARD, Judge.
In this medical malpractice action plaintiff, Tammy Bowers, seeks damages from defendant Ronald J. Liuzza, D.D.S., a Professional Dental Corporation, for nerve damage sustained as a result of a dental procedure. The record shows that plaintiff sustained an injury to the inferior alveolar nerve during an implant procedure performed by Dr. Liuzza. The result of the nerve damage is that plaintiff developed a dysthesia or hyperthesia which is described as an increased sensory symptom, or a condition that causes a numbness and tingling sensation in the affected area. At trial defendant stipulated to liability and medical expenses in the amount of $2,520.00. Thus, the only issue at trial was the quantum of damages.
| aAfter a jury trial, judgment was rendered in favor of plaintiff in the total amount of $42,520.00. The jury award consisted of the following:
Medical expenses $ 2,520.00
Past pain and suffering $20,000.00
Future pain and suffering $ 4,000.00
Past mental anguish $ 4,000.00
Future mental anguish $ 4,000.00
Permanent disability -0-
Humiliation and embarrassment $ 4,000.00
Loss of enjoyment of life $ 4,000.00
Plaintiff filed a “Motion for Judgment Notwithstanding the Verdict, Alternatively, Motion for New Trial, Alternatively Motion for Additur”. After considering the above motion, the trial court rendered judgment denying plaintiffs Motion for Judgment Notwithstanding the Verdict, but granted the Motion for Additur. In so doing the trial court added an award of $10,000.00 for permanent disability, thereby increasing the total award to $52,500.00. Plaintiff has appealed that judgment seeking an increase in damages.
At trial plaintiff testified that Dr. Liuzza had extracted a tooth and subsequently implanted a dental device in the resulting gap. On December 19, 1996 Dr. Liuzza placed the implant. At that time he gave Ms. Bowers injections of a drug which she assumed to be Novocain. He performed the procedure. After the procedure she returned home. She stated that she felt numbness in her mouth and face which she attributed to the Novocain. Ms. |4Bowers explained that the area affected was her entire bottom lip, her chin, and part of her face.
The next morning she experienced some pain and continued numbness. When the numbness continued over the weekend, she became concerned. Dr. Liuzza was on vacation that week and Ms. Bowers had an appointment with one of his associates scheduled for one week following the surgery to have the sutures removed. Ms. Bowers stated that she called Dr. Liuzza’s office to complain of the numbness on Monday morning and was told to wait until her scheduled appointment to come in. However, when she arrived the following week for her appointment, she was told that the associate would not see her and she would have to wait until Dr. Liuzza returned.
On December . 30, 1996 Ms. Bowers saw Dr. Liuzza, who removed the sutures and explained that numbness sometimes happens after such a procedure. Ms. Bowers told Dr. Liuzza that the possible adverse effects of the surgery were never explained to her, and that she did not sign a release form.
In mid-January, 1997 Ms. Bowers consulted Dr. Demarcus Smith, who removed *90 the implant and replaced it with a shorter one. However, the numbness continued. She also consulted Dr. Michael Wilensky, a neurologist, to see if anything could be done to lessen the effects of the numbness. He tried several prescription drugs which did not help.
Ms. Bowers stated that at the time of trial, she was still experiencing numbness and tingling sensations in the right side of her lip extending up to the corner of her mouth. The numbness also includes part of the right side of her chin and her cheek. Ms. Bowers testified that if nothing is touching |Bher face it just feels numb. However, if her face is touched she experiences a radiating, tingling sensation which is similar to that which one feels when a foot has “fallen asleep” and is “waking up again”. It is an irritating, crawling sensation.
She stated that the condition affects her twenty-four hours a day. If she rolls over in her sleep and something touches her face it will wake her up. Washing her face, brushing her teeth and putting on makeup also cause discomfort. She also has trouble kissing her children.
On the job she must hold the telephone to her left ear. She also finds it difficult to make presentations to groups of people, which is a requirement of her employment. At first, she felt like she was constantly drooling. She has since realized that it is only a sensation and has adjusted to that feeling. However, at first it made her very self-conscious when giving the presentations.
Ms. Bowers, who is divorced, stated that she does occasionally date. But, because she is uncomfortable being kissed, she is now afraid of intimacy. If she ever entered into another serious relationship, she would have to take one of the medications prescribed by Dr. Wilensky to relieve the tingling sensation.
On cross-examination, Ms. Bowers explained that she was trying to resolve marital difficulties at the time she had the implant. She admitted that she was experiencing great stress at that time. The efforts were unsuccessful and she was subsequently divorced. She stated that now her life is back to normal and she is no longer under the stress caused by the breakup of her marriage.
|rAt trial plaintiff presented testimony from Dr. Demarcus Smith, an expert in the field of oral and maxillofacial surgery. Dr. Smith testified that he treated Ms. Bowers beginning on January 15, 1997. She sought treatment from Dr. Smith for a numbness in the right lower lip, chin, and teeth. She reported that the problem stemmed from a surgical implant done in December, 1996 to replace a missing tooth. The complaint was one of an altered sensation, “like a shot that didn’t wear off’. Dr. Smith describe Ms. Bowers as being very emotional about the problem. She was reduced to tears as she explained what happened.
Dr. Smith conducted a physical examination which showed that the first molar on the lower right side of the mouth was missing. The gums were well-healed and there was no inflammation, infection and no destroyed tissue. The second stage of the examination involved feeling. Dr. Smith explained that he uses a small mo-nofilament line to check sensation on the skin.
Dr. Smith further explained that the nerve involved is the inferior alveolar nerve which goes from the midline to the corner of the mouth to the bottom of the chin, and involves the teeth on that side and the gums from the middle of the lower teeth to about the first molar. The third stage of the examination was an x-ray of the affected area. Dr. Smith testified that the x-ray showed that there was an implant at the site where a tooth had been removed. The x-ray showed the canal, in which the nerve lies, surrounded by bone. It also showed that the implant was a couple of millimeters into the top of the nerve.
*91 |7Pr. Smith’s recommendation was to remove the implant and replace it with a shorter one which would not touch the nerve. That surgery was done on January 17, 1997. In that surgery, Dr. Smith removed the implant, enlarged the diameter of the hole slightly, and implanted a shorter device. In due course, the implant healed and the missing tooth was replaced. However, the effects of the nerve damage continued.
Dr. Smith explained that the result of the damage was that Ms. Bowers experienced numbness and dysesthesia, which is the perception of something different than the stimulus. Dr. Smith described the sensation as the one an individual commonly gets when a foot “goes to sleep”. It is a feeling of numbness which then burns, and feels like “pins and needles” as the nerve rejuvenates.
Six months after the surgery, Dr. Smith again tested Ms. Bowers. He found that there remained an area about the size of a thumb across the lower lip coming down onto the chin where there was no response to the smallest filament, which showed a decrease in her ability to perceive things. Dr. Smith opined that the damage done to the nerve by the original implant is permanent.
On cross-examination Dr. Smith explained that the damage would cause trouble from the corner of the mouth to the midline of the jaw. It would not travel up the jaw or up the side of the face. He also confirmed that he saw no signs of physical trauma such as an ulcerated lip caused from biting a numb area. He also stated that Ms. Bowers’ complaints did not include pain, other than that associated with the dysesthesia. Dr. Smith testified that the nerve damage would not cause Ms. Bowers to drool. [ sFurther, she showed no signs of functional problems such as an inability to chew or bite.
Dr. Smith testified that he has treated many patients who have suffered similar nerve damage from various causes. He stated that they adapt to the injury. He explained the adaption process by saying that when the injury first occurs, it causes numbness. He stated that the body adapts on several levels. A patient could have an increase of sensation in the surrounding area such that the affected area gradually gets smaller over time. He also said there are different kinds of fibers in the bundle and that the patient learns to interpret the information coming from those fibers differently.
At trial the plaintiff read into the record a deposition taken from Dr. Michael Wil-ensky, a neurosurgeon, with whom Ms. Bowers consulted oh recommendation of her attorney. Dr. Wilensky testified that he examined Ms. Bowers on September 22, 1998. At that time she complained of numbness in the face on the right side. She described having a tooth removed and replaced with an implant. She explained that she developed numbness past the mid-line of the chin to the cheek into the jaw line on the right side after the procedure was done. She also told Dr. Wilensky the details of the second surgery performed by Dr. Smith.
Ms. Bowers told Dr. Wilensky that she saw no improvement in her condition after the second surgery. She continued to experience numbness on the side of her face and inside her mouth. She can eat and has no problems chewing or swallowing. However, she experiences irritation of the 19face if she talks too much. Further, she cannot stand to be touched on the cheek because of the numbness.
Dr. Wilensky conducted a neurological examination of the facial area. The tests he conducted consisted of two subjective tests in which he used a pin and a Kleenex to test the sensation on the face. Dr. Wilensky prescribed Neurontin to treat the pain and discomfort. He explained that Neurontin blocks the nerve firing impulses in a peripheral nerve to stop the tingling sensation.
Dr. Wilensky stated that cases of par-esthesia like Ms. Bowers are not uncom *92 mon, and he has treated many. Many simply resolve over time with no treatment. Those that do not are not treatable. Those patients receive treatment simply to relieve the symptoms,- not to cure the problem. Dr. Wilensky testified that whether the condition resolves depends on the type and extent of the injury of the nerve. In any case, if the condition persists for over one year it is likely to be permanent.
Dr. Wilensky explained that Ms. Bowers suffered an injury to the mandibular branch of the trigeminal nerve. The trige-minal nerve innervates the entire side of the face. The mandibular branch is a part of that nerve which is in the lower branch. Thus, her problem would be localized to that lower branch. Her complaint was confined strictly to the mid-portion of the ear down to the chin, which would coincide with the inferior alveolar branch of the nerve. It is a very localized isolated branch of the nerve.
In a subsequent visit to Dr. Wilensky, Ms. Bowers complained that the Neurontin suppressed the tingling sensation to the point that the lip felt completely numb and she had no feeling at all in that area. Dr. Wilensky 110advised Ms. Bowers to use the Neurontin on occasion when the tingling was especially unpleasant.
Dr. Randy Green, a dentist who served as a member of the medical review panel which reviewed Ms. Bowers’ case, testified that the panel found the standard of care provided by Dr. Liuzza fell below the normal standards. He explained that the correct implant procedure involves inserting an implant in the bone. It should not touch the soft tissue of the nerve. In the instant case Dr. Liuzza actually touched the nerve, resulting in paresthesia. Dr. Green testified that this paresthesia can be temporary or permanent. If the condition continues for more than one year it is likely to become permanent. Dr. Green further testified that after final restoration of the dental implant site, it is unlikely that Ms. Bowers would need any further dental or medical treatment.
A second member of the medical panel which reviewed the matter, Dr. Levy, also testified for the plaintiff. His opinion and testimony corroborated that of Dr. Green.
Ms. Elise Saltaformaggio, plaintiffs best friend, testified at trial. She stated that, although she moved to Georgia in 1995, she and the plaintiff remained close friends who continue to speak on the telephone weekly. Ms. Saltaformaggio stated that Ms. Bowers often discussed the emotional problems she had after the implant. Ms. Saltaformaggio described Ms. Bowers as an affectionate person who is very close to her children. The paralysis in her face makes her unable to kiss and hug her children freely. Ms. Bowers also expressed her fear of intimacy in a relationship with a man because of her facial paralysis.
|nOn cross-examination Ms. Saltafor-maggio admitted that not every conversation involved Ms. Bowers’ medical problems. Ms. Saltaformaggio stated that for a period of about one year around the time of the implant Ms. Bowers often discussed her marital problems.
The defense presented evidence from the third member of the medical panel which reviewed Ms. Bowers’ claim. Dr. Louis Genard, testified that there was no objective evidence that the implant came into contact with the nerve. That fact was presumed because of the subjective complaints made by Ms. Bowers. He further stated that if the entire nerve is damaged or severed, the result would be anesthesia or total loss of nerve function. Dr. Genard explained that there are two components of nerve activity, the functional one and the sensory one. Here it is the sensory component which is affected. He further stated that the continued tingling sensation in the nerve indicates the possibility that the nerve may regenerate because there is some innervation that is getting through the nerve.
*93 As previously stated the only issues presented for our review concern the amount of damages awarded. On appeal plaintiff argues that the awards of damages in every category are too low. The total award suggested by plaintiff is $786,518.00.
Our standard of review of an award of damages was set forth by the Louisiana Supreme Court in the case of Theriot v. Allstate Ins. Co., 625 So.2d 1837, 1340-1341 (La.1993), as follows:
Our jurisprudence has consistently held that in the assessment of damages, much discretion is left to the judge or jury, and upon appellate review such awards will be disturbed only when there has been a clear abuse of that discretion, Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). And, “[i]t |1Pis only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review be considered either excessive or insufficient,” Reck v. Stevens, 373 So.2d 498, 501 (La.1979). Appellate courts review the evidence in the light which most favorably supports the judgment to determine whether the trier of fact was clearly wrong in its conclusions. Arceneaux v. Dominque[Domingue], 365 So.2d 1330 (La.1978). Before an appellate court can disturb the quantum of an award, the record must clearly reveal that the jury abused its discretion. In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff. Only after analysis of the facts and circumstances peculiar to the particular case and plaintiff may an appellate court conclude that the award is inadequate. See Reck v. Stevens, supra; Cariere v. State Farm, Insurance Co., 467 So.2d 867 (La.App. 2d Cir.1985).
Prior awards under similar circumstances serve only as a general guide. If the appellate court determines that an abuse of discretion has been committed, it is then appropriate to resort to a review of prior awards, to determine the appropriate modification of the award. In such review, the test is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. See, Reck v. Stevens, supra; Wactor v. Pickens Lumber Co., 505 So.2d 815 (La.App. 2d Cir.1987), writ denied, 508 So.2d 827 (La.1987). In instances where the appellate court is compelled to modify awards, the award will only be disturbed to the extent of lowering or raising an award to the highest or lowest point which is reasonably within the discretion afforded the trial court. American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429 (La.1991); Scott v. Hospital Service District No. 1 of the Parish of St. Charles, 496 So.2d 270 (La.1986); Carollo v. Wilson, 353 So.2d 249 (La.1977); Coco v. Winston Industries, Inc., supra.
In support of her position, plaintiff cites Koslowski v. Sanchez, 576 So.2d 470 (La.1991)[1]. In that case the plaintiff had a similar injury for which the jury made an award of $250,000.00. In affirming that award, the Louisiana Supreme Court noted that in a case of this nature it is difficult to review an award of damages because the complaints are so subjective. However, we find that, although not disabling or visible, the injury is a 1T ¡¡constant source of discomfort. As noted by the court in Koslowski v. Sanchez, supra, an injection of novocaine is a common experience and most of the population would be familiar with the numbness associated with it.
After consideration of the suffering endured by the plaintiff, a thirty-year-old woman, and the nature of the condition, which was verified by competent medical evidence, we find the awards of past pain and suffering, future pain and suffering, *94 past mental anguish, future mental anguish, humiliation and embarrassment, and loss of enjoyment all to be abusively low.
The testimony supports the plaintiffs claim that the condition is unchanged from the sensations first experienced, and that it is permanent. Further, she experienced considerable mental anguish during the initial adjustment to her condition. There was testimony that she felt as though she was constantly drooling, which made it difficult for her to conduct her normal daily routine. She has since learned that it is not the reality and has adjusted to that feeling.
For the above cited reasons, we amend the award of damages to reflect the following:
1) past pain and suffering $40,000.00
2) future pain and suffering $20,000.00
3) past mental anguish $40,000.00
4) future mental anguish $25,000.00
5) humiliation and embarrassment $20,000.00
6) loss of enjoyment of life • $20,000.00
|uWe believe the increases resulting in the above awards are consistent with the lowest reasonable point, and is therefore, within our discretion. We affirm the following awards by the trial court:
1) medical expenses $ 2,520.00
2) permanent disability $10,000.00
In all other respects, we affirm the judgment.
Plaintiff also asserts that the jury erred in failing to award damages for future medical expenses. In order to recover future medical benefits, the plaintiff must prove that these expenses will be necessary and inevitable. Future medical expenses must be established with some degree of certainty and must be supported with medical testimony and estimation of probable cost. Hopstetter v. Nichols, 98-185 (La.App. 5 Cir. 7/28/98), 716 So.2d 458, 462, writ denied, 98-2288 (La.11/13/98), 731 So.2d 263. A review of the record in this case does not show that the plaintiff has established justification for an award for future medical expenses. The consensus of medical opinion is that plaintiffs condition is permanent and cannot be helped by any future medical treatment. The only evidence which in any way related to future medicals was contained in the Ms. Bowers’ testimony. She testified that if she were to become intimately involved in a new relationship, she would likely take some medication to control the tingling sensation in the affected area. We do not find that evidence sufficient under the law to support an award of future medical expenses.
11fiFor the foregoing reasons, we amend the judgment to increase various damage awards as set forth infra. In all other respects the judgment of the trial court is affirmed.
AMENDED AND AS AMENDED AFFIRMED.

. Overruled on other grounds by Russo v. Vasquez, 94-2407 (La. 1/17/95), 648 So.2d 879.